## In the Matter of L.Z.

### Appeal of L.F., Mother.

Superior Court of Pennsylvania.

Argued Oct. 16, 2013.

Filed April 29, 2014.

Edward M. Flannery, Philadelphia, for appellant.

Patricia A. Korey, Philadelphia, for appellee.

Michael E. Angelotti, Philadelphia, for Dept. of Human Services, participating party.

BEFORE: BENDER, P.J., FORD ELLIOTT, P.J.E., BOWES, PANELLA, DONOHUE, SHOGAN, LAZARUS, OLSON and WECHT, JJ.

OPINION BY OLSON, J.:

Appellant, L.F. ("Mother"), appeals from the juvenile court's January 6, 2012 order adjudicating L.Z. ("Child") dependent, finding aggravated circumstances, and finding Mother a perpetrator of child abuse. We affirm in part and vacate in part.

The juvenile court recited the following facts in its Pa.R.A.P.1925(a) opinion:

On December 31, 2011, the Department of Human Services (hereinafter, "DHS") received a Child Protective Services (hereinafter, "CPS") report alleging that [ ] Child was brought to Abington Memorial Hospital with a deep cut to the base of his penis, a bruise on each of his cheeks, and severe diaper rash.

[* * *]

On January 6, 2012, there was an adjudicatory hearing held before Judge [Ann M.] Butchart. Mother was present at the hearing and was represented by counsel. The [c]ourt heard testimony from DHS social worker, Kelly Brown [ ("Ms. Brown") ]. Ms. Brown testified that she met with Mother at the hospital on December 3, 2011. Mother told [Ms. Brown] that she had been residing with

her paramour for the two days prior to the incident and that she had not seen [ ] Child since that time. Mother told Ms. Brown that she and [ ] Child resided with [R.F., Child's maternal aunt ("Aunt") ], and that [she and Aunt] were the two primary caregivers for [ ] Child. In her testimony, Ms. Brown stated that Mother indicated that [ ] one of the green circular marks on [ ] Child's cheekbones was caused by a fall where he hit his face on a table. Mother was unable to provide any explanation as to the cause of the other mark. It was also noted that [ ] Child consistently resided with Mother. Ms. Brown testified that she had received another report that [ ] Child was unkempt, his feet were filthy, and his toes were dirty. It was also learned that while Mother and [Aunt] were transporting [ ] Child to the hospital they stopped at Dunkin['] Donuts. Mother was diagnosed as suffering from bipolar disorder. However, Mother's level of compliance with treatment was unknown.

Ms. Brown testified that there was a General Protective Services (hereinafter, "GPS") report that was substantiated against Mother, regarding lack of supervision for [ ] Child and [ ] Child suffering from a yeast infection. Mother was not indicated as a perpetrator of abuse either by commission or omission for the CPS report. [Aunt] was indicated as a perpetrator of abuse in the CPS report.

The [c]ourt also heard testimony from Dr. Deborah Silver [ ("Dr. Silver") ], the Medical Director of the Pediatric Inpatient Unit at Abington Memorial Hospital. Dr. Silver was qualified as an expert in pediatric medicine. Dr. Silver received training in identifying and treating child abuse and during the course of her career had seen several cases of abuse. Dr. Silver testified that she believed [ ] Child was the victim of child abuse. Dr. Silver stated that in cases where there is a suspicion of child abuse pictures were taken as a matter of ordinary course. The pictures provided to the [c]ourt indicated a bruise on [ ] Child's left cheekbone, a bruise on his right cheek, a penis laceration in his genital area, and a significant diaper rash. Dr. Silver testified that [ ] Child's penile laceration was an "extremely uncommon presentation" for a child of his age. Dr. Silver also indicated in her professional opinion that the injury caused [ ] Child severe pain. She also stated that the injury appeared to be non-accidental in nature. The explanation for the injury provided by [Aunt] was that [ ] Child pulled firmly on his foreskin and put traction on his penis causing it to bleed. Dr. Silver opined that this explanation did not seem plausible because [ ] Child was not strong enough to cause such an injury to himself.

Dr. Silver described [ ] Child's bruises in detail. [ ] Child's bruises were very dark and were located on opposite sides of his face. He had a large bruise in the meat of his right cheek in the buckle area as well as his left cheekbone. Mother stated that the bruises were caused when [ ] Child fell on top of a T.V. table. Dr. Silver testified that in her professional opinion the explanation provided was not consistent with the injuries. Dr. Silver opined that the injury to the right cheek was caused by someone grabbing [ ] Child's face and "squeezing it between their fingers and planting their thumb in the cheek." Dr. Silver stated that [ ] Child could not have been very comfortable and that this was a common abuse injury that she saw. Dr. Silver testified that although she could not provide an exact date of when [ ] Child suffered the bruises, she

did state that they were less than a week and more than a day old.

Mother reported that [ ] Child's diaper rash was caused by diarrhea. Dr. Silver reported that the location of [ ] Child's diaper rash indicated that he had been in urine for extended periods of time. Mother's explanation for the rash was not compatible to the location of the rash. [ ] Child was also treated for a yeast infection. Dr. Silver testified that [ ] Child was very dirty. [ ] Child had dirt from his knees to his toes and his toenails were encrusted with black dirt. Dr. Silver diagnosed [ ] Child's injuries as "non-accidental trauma."

Juvenile Court Opinion, 5/17/12, at 1–5 (record citations and footnotes omitted).

As a result of the foregoing, DHS filed a petition on December 9, 2011 seeking to have Child adjudicated dependent. The Defender Association of Philadelphia Child Advocacy Unit was appointed counsel and guardian *ad litem* ("Child Advocate") for Child. On January 4, 2012, the Child Advocate filed a motion seeking a ruling that Child was a victim of child abuse, that Mother was the perpetrator of said abuse, and that aggravated circumstances as defined by 42 Pa.C.S.A. § 6302 existed. On January 6, 2012, a hearing was held on DHS' dependency petition and the Child Advocate's motion. At the conclusion of the hearing, the juvenile court adjudicated Child dependent based upon present inability to care for Child and child abuse. The juvenile court specifically found that Child was the victim of abuse perpetrated by Mother, and that there were aggravated circumstances. Aggravated Circumstances Order, 1/6/12. As a result of the finding of aggravated circumstances the juvenile court ordered that "no efforts are to be made to preserve the family and reunify [ ] Child with [ ] Mother." *Id.*

Mother filed a timely notice of appeal on February 6, 2012,[1] in which she raised three issues: 1) the juvenile court erred in finding Mother responsible for child abuse under 23 Pa.C.S.A. § 6303; 2) the juvenile court erred in finding that aggravated circumstances existed under 42 Pa.C.S.A. § 6302; and, 3) the juvenile court erred in finding that DHS did not need to make reasonable efforts to reunify. In a prior opinion, a divided panel of this Court affirmed in part and vacated in part the order of the juvenile court. Specifically, the juvenile court's order was affirmed insofar as it declared Child dependent. The juvenile court's findings that Mother was the perpetrator of abuse and that aggravated circumstances existed were vacated. Moreover, the juvenile court's order permitting cessation of reunification efforts was vacated. Appellee, the Child Advocate, sought reargument of our decision and we granted *en banc* review. This matter is now ready for this Court's consideration.

In her brief upon reargument, Mother raised three issues for the *en banc* Court's review:

1. Did the [juvenile] court err in finding that aggravated circumstances existed under 42 Pa.C.S.A. § 6303 [*sic*]?

2. Did the [juvenile] court err in finding that DHS need not make reasonable efforts to reunify [Mother and Child]?

3. Did the [juvenile] court err when it found that Mother was responsible for child abuse under 23 Pa.C.S.A. § 6303?

1. *See* Pa.R.A.P. 905(a)(2) and Pa.R.A.P. 1925(b). The 30th day in the appeal period fell on Sunday, February 5, 2012. The notice of appeal filed on Monday, February 6, 2012 is therefore timely.

Mother's Reformatted Brief at 3. Although Mother and Appellee briefed all three issues, Mother's counsel advised this Court during oral argument that Mother was waiving the first two issues. When asked for clarification, Mother's counsel stated that at some point during the appeal, Mother voluntarily relinquished her parental rights as to Child. Therefore, she was waiving any arguments with respect to a finding of aggravated circumstances and the cessation of reunification efforts. Hence, Mother's counsel stated during oral argument that the only issue for this Court to decide is whether the juvenile court erred when it concluded that Mother was a perpetrator of child abuse.

 Yet, before we are able to consider the merits of Mother's remaining claim, we must first determine whether said claim is moot. Indeed, although neither party has argued that Mother's claim is moot, we may *sua sponte* raise the issue of mootness, as we generally "cannot decide moot or abstract questions, nor can we enter a judgment or decree to which effect cannot be given." *Orfield v. Weindel*, 52 A.3d 275, 277 (Pa.Super.2012) (internal citations and quotations omitted); *see also Commonwealth v. Pruitt*, 615 Pa. 182, 41 A.3d 1289 (2012) (*sua sponte* dismissing the appeal as moot); *In re Estate of Baeher*, 533 Pa. 70, 618 A.2d 944 (1993) (same).

Given that Mother's appeal lies from the juvenile court's order adjudicating Child dependent, and given that Mother has admitted to this Court that she no longer has any parental rights to Child, one could argue that Mother's claim of error is moot. We, however, conclude that Mother's claim on appeal is not moot.

 As we have explained:
The cases presenting mootness problems involve litigants who clearly had standing to sue at the outset of the litigation. The problems arise from events occurring after the lawsuit has gotten underway—changes in the facts or in the law—which allegedly deprive the litigant of the necessary stake in the outcome. The mootness doctrine requires that an actual controversy [exist] at all stages of review, not merely at the time the complaint is filed.

As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect. . . .

Nevertheless, this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

*In re D.A.*, 801 A.2d 614, 616 (Pa.Super.2002) (*en banc*) (internal citations and quotations omitted).

With respect to the third of the above-listed exceptions, we have held that—in determining whether a party "will suffer some detriment due to the decision of the trial court"—a court may consider the collateral legal consequences of the court order. For example, in *In re D.A.*, the child was adjudicated dependent and the mother appealed to this Court. Within the moth-

er's appellate brief to this Court, the mother primarily argued that the juvenile court erred when it adjudicated the child dependent. *Id.* at 615 and 618. However, during the pendency of the mother's appeal, the juvenile court closed the dependency case and dissolved the child's status as a dependent child. *Id.* at 616. Notwithstanding this fact, an *en banc* panel of this Court held that the mother's appeal was not moot, as the dependency adjudication could potentially cause the mother detrimental collateral legal consequences in the future. Specifically, we held:

> [The m]other will suffer a detriment due to the trial court's initial decision declaring [the child dependent]. The finding of dependency regarding [the child] could detrimentally affect any future proceedings in which [Children, Youth, and Family] would be involved with this family, either with [the child] directly or with any other child in the family. In determining whether a child is dependent, "the court must ascertain . . . what sort of parental care the child received in the past. . . ." *In the Interest of Ryan C.*, 294 Pa.Super. 417, 440 A.2d 535, 536 (1982). . . . Any future allegations regarding [the m]other's care of [the child] necessarily will encompass consideration of the dependency finding rendered herein.

*Id.* at 616–617; *see also In re E.B.*, 898 A.2d 1108, 1111 (Pa.Super.2006) (citing *In re D.A.* and holding that the mother's appeal from the adjudication of dependency was not moot—even though the juvenile court discharged the dependency petition during the pendency of the appeal—"since due to the adjudication, [the] mother will suffer a detriment in any future proceedings with DHS"); *cf. In the Interest of C.L.*, 436 Pa.Super. 630, 648 A.2d 799, 800 (1994) (holding that the mother's paramour had standing to appeal the adjudication of dependency, as the adjudication was based upon a direct finding that the paramour sexually abused the children and the juvenile court ordered the paramour to have no contact with the children).

Here, Mother is challenging the juvenile court's specific determination that Mother was the perpetrator of child abuse, as those terms are defined under the Child Protective Services Law ("the Law"), 23 Pa.C.S.A. §§ 6301–6386. *See* Juvenile Court Order of Adjudication and Disposition, 1/6/12, at 1–3 (declaring "[t]he [juvenile c]ourt hereby finds that [Child] is a victim of child abuse as defined at 23 [Pa. C.S.A. §] 6303, in that as to [M]other"). Clearly, this determination has caused, and will cause, Mother detrimental collateral legal consequences. Indeed, the judicial adjudication that Mother was a perpetrator of child abuse constitutes the legal prerequisite for the Philadelphia DHS to lodge a "founded report" of child abuse against Mother, with the Department of Public Welfare of the Commonwealth. *See* 23 Pa.C.S.A. § 6303(a) (defining a "founded report" as "[a] child abuse report made pursuant to [the Law] if there has been **any judicial adjudication** based on a finding that a child who is a subject of the report has been abused, including the entry of a plea of guilty or *nolo contendere* or a finding of guilt to a criminal charge involving the same factual circumstances involved in the allegation of child abuse") (emphasis added).

Pursuant to statute, once Mother is named as the perpetrator of abuse in a founded report, Mother immediately suffers a number of legal sanctions, including: Mother's name is placed in the Statewide central register;[2] Mother may not become

---

2. 23 Pa.C.S.A. § 6338(a).

a school employee;[3] and, for five years, Mother may not become an adoptive parent, may not become a foster parent, may not be hired by an administrator of child-care services, may not be certified to operate a family day-care home, and may not be hired in an "occupation[ ] with a significant likelihood of regular contact with children."[4,5]

Given the above, it is clear that the juvenile court's adjudication—finding Mother to be the perpetrator of child abuse—will cause Mother substantial, detrimental collateral legal consequences. Therefore, pursuant to *In re D.A.*, we conclude that Mother's challenge to this specific aspect of the juvenile court's adjudication is not moot, as Mother "will suffer some detriment due to the decision of the [juvenile] court." *In re D.A.*, 801 A.2d at 614–617. We may thus reach the merits of Mother's third claim.

█ We review the juvenile court's decisions in a dependency action as follows: [T]he standard this Court employs is broad. We accept the [juvenile] court's factual findings that are supported by

the record, and defer to the court's credibility determinations. We accord great weight to this function of the hearing judge because [s]he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [her]. Relying upon [her] unique posture, we will not overrule [the juvenile court's findings] if they are supported by competent evidence.

*In re R.P.*, 957 A.2d 1205, 1211 (Pa.Super.2008).

█ Mother challenges the juvenile court's finding that she is a perpetrator of abuse pursuant to §§ 6303(b) and 6381(d) of the Law.[6] In order to find a person a perpetrator of abuse pursuant to the Law, the record must first show by clear and convincing evidence that the child suffered abuse, as defined by § 6303(b). *In the Matter of Read*, 693 A.2d 607, 610 (Pa.Super.1997), *appeal denied*, 555 Pa. 708, 723 A.2d 1025 (1998). In finding that Child suffered from abuse, the juvenile court cited to the following subsections of § 6303(b):

Moreover, and regardless, the above-described legal sanctions that arise from the entry of the founded report occur immediately upon entry of the founded report—and do not await administrative or appellate proceedings.

3. 23 Pa.C.S.A. § 6355.

4. 23 Pa.C.S.A. §§ 6344, 6344.1, and 6344.2.

5. As our Commonwealth Court has explained, where an individual is named as the perpetrator of abuse in a founded report, the individual may file an administrative appeal with the Department of Public Welfare and request that the report be expunged. *J.G. v. Dep't of Pub. Welfare*, 795 A.2d 1089, 1092–1093 (Pa. Cmwlth.2002); 23 Pa.C.S.A. § 6341(a)(1); 2 Pa.C.S.A. § 504. Yet, as our Commonwealth Court has held, the individual named in a founded report is only entitled to an administrative hearing on the expunction request in limited circumstances. *See, e.g., K.R. v. Dep't of Pub. Welfare*, 950 A.2d 1069 (Pa.Cmwlth. 2008) (holding that the named perpetrator in a founded report has a limited right to receive an administrative hearing to determine whether the report must be expunged).

6. Mother concedes Child was dependent within the meaning of the Pennsylvania Juvenile Act ("the Juvenile Act") based upon Mother's inability to care for the Child. N.T., 1/6/12, at 25; Mother's Reformatted Brief at 8. The Juvenile Act defines a dependent child as one who is "without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S.A. § 6302. The juvenile court's finding of abuse is reviewable on appeal even if the parent does not dispute the underlying adjudication of dependency. *In re J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1021 (1993).

(i) Any recent act or failure to act by a perpetrator which causes non-accidental **serious physical injury** to a child under 18 years of age.

[* * *]

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of **serious physical injury** to . . . a child under 18 years of age.

(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

23 Pa.C.S.A. § 6303(b)(1)(i), (iii), and (iv) (emphasis added); Juvenile Court Opinion, 5/17/12, at 7. The Law defines "serious physical injury" as

[a]n injury that:

(1) causes a child severe pain; or

(2) significantly impairs a child's physical functioning, either temporarily or permanently.

23 Pa.C.S.A. § 6303(a).

The record reflects that Child suffered a deep laceration to his penis, bruising on his cheeks, and severe diaper rash. Dr. Silver testified that the penile laceration (which required generalized sedation and surgical repair) was clearly non-accidental and would have caused Child severe pain. N.T., 1/6/12, at 37–38. As for the bruising to the cheeks, Dr. Silver testified that such bruising usually occurs by someone grabbing the face and squeezing the cheeks. *Id.* at 41. However, Dr. Silver stopped short of testifying that the acts which created the bruises caused Child severe pain. Instead, Dr. Silver testified that such actions "couldn't have been very comfortable" for Child. *Id.* at 42. As for the diaper rash, Dr. Silver testified that it was caused by a yeast infection and that it responded well to treatment. *Id.* at 43.[7] Moreover, Child's legs and feet were dirty. However, nothing in the record indicated that this condition resulted in any injury to Child. Dr. Silver found no other evidence of lack of hygiene. *Id.* at 45–46.

The record does not support a finding that the bruising, the diaper rash, or Child's dirty condition constituted abuse for purposes of § 6303(b)(i) or (iii) of the Law, as there was no evidence that these conditions caused serious physical injury (as defined by § 6303(a)) to Child. The record also fails to support a finding that these conditions endangered Child's life or development or impaired Child's functioning, as required by § 6303(b)(iv).

We have no doubt that the bruising, the diaper rash, and Child's dirty condition caused significant discomfort for Child. We in no way seek to minimize the unhealthy and injurious nature of these conditions. However, based on the record before us, we are constrained to conclude that DHS failed to meet its burden of establishing by clear and convincing evidence that the bruising, the diaper rash, or the poor hygiene constituted child abuse as expressly defined by the Law.[8]

---

7. Dr. Silver also testified that Mother told her she had been "struggling with trying to treat the diaper rash at home with various over-the-counter preparations." N.T., 1/6/12, at 43.

8. Recent amendments to the Law offer further support to this interpretation of § 6303(b). On December 18, 2013, Pennsylvania Governor Thomas W. Corbett signed into law several measures affecting Pennsylvania's child abuse prevention laws. Relevant to the definition of "child abuse" found in § 6303(b), the recently-enacted measures leave in place the current definition until December 30, 2014. On December 31, 2014, however, the term "child abuse" will be expanded to include "intentionally, knowingly

It is, however, clear that the penile laceration constituted child abuse under the Law, as the laceration constituted a non-accidental, serious physical injury that caused Child severe pain. Therefore, we affirm the juvenile court's finding that Child suffered child abuse because the penile laceration meets the definition of "serious physical injury." The issue now is whether the juvenile court erred in finding that Mother was the perpetrator of this abuse.

■■■ Pursuant to § 6381(d) of the Law, "[e]vidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child." 23 Pa.C.S.A. § 6381(d). In other words, "[o]nce abuse has been established [by clear and convincing evidence], a finding that the caretakers were the abusers need only be shown by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers because the likelihood that the abuse occurred at the hands of someone other than a caretaker is small." *Read,* 693 A.2d at 610. Section 6381(d) "creates a rule that is procedural in nature, particularly an evidentiary presumption, as opposed to a rule of substantive law." *In re J.G.,* 984 A.2d 541, 547 (Pa.Super.2009) (*en banc*), *appeal denied,* 605 Pa. 715, 991 A.2d 313 (2010). Thus, under § 6381(d), "a person is an abuser if

it is established that the child suffered a particular type of harm, namely of such nature as would ordinarily not be sustained or exist except by reasons of the act or omissions, **and the person is proved to have had responsibility for the welfare of the child at the time of the injury."** *Id.* (internal quotations removed; emphasis supplied).

Section 6381(d) does not, however, permit the court to designate a parent a perpetrator of abuse where the record fails to establish that the child was in the parent's care at the time of the injury. Where the record is unclear as to which parent or person was responsible for the child at the time of the abuse, "the viability of the presumption in [§ 6381(d) ] is questionable." *Id.* As this Court noted in *In re J.G.:*

> Given the facts of a particular case, it may be impossible for [Children Youth and Families] or the trial court to determine which perpetrator(s) committed the abuse. This is especially true where, as here, the evidence is inconclusive as to who had control or supervision over the child **at the time of the abuse.** In these conditions, the presumption in 23 Pa.C.S.A. § 6381(d) is inherently self-rebutting, and applying it to one or both persons alleged to be the perpetrators would be arbitrary and capricious[.]

984 A.2d at 548 (emphasis supplied). *See also C.E. v. Dep't of Pub. Welfare,* 917 A.2d 348, 356–57 (Pa.Cmwlth.2007) (Section 6381(d) presumption does not apply where the alleged perpetrator was one of

or recklessly ... [c]ausing **bodily injury** to a child through any recent act or failure to act." *See* 23 Pa.C.S.A. § 6303(b.1) (emphasis added), effective December 31, 2014. In turn, the impending provision defines "bodily injury" as the "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a), effective December 31, 2014. The

eventual expansion of the term "child abuse" to include "bodily injury," not just "serious bodily injury" as it presently does, supports our conclusion that the injuries with which we are confronted in this case do not constitute child abuse as contemplated within the current version of § 6303(b).

several adults who was responsible for the child on part of the day on which the injury occurred).

In the case before us, the record establishes that Mother and Child lived with Aunt and that Mother and Aunt were Child's primary caregivers. N.T., 1/6/12, at 9. Mother advised the DHS caseworker, Kelly Brown, that Aunt cared for Child when Mother was at work and when Mother spent the night out. *Id.* On the date Child was brought to the hospital, Child was at Aunt's house. *Id.* at 8. Mother, who was staying with her boyfriend, received a call from Aunt advising her that Child was bleeding from his penis. *Id.* Mother picked Child up and she and Aunt took Child to the hospital.[9] *Id.* Mother last saw Child two days before receiving the call from Aunt about the injury to Child's penis. *Id.* at 8. Dr. Silver testified that the laceration to Child's penis was fresh. *Id.* at 45. Specifically, Dr. Silver noted that "[t]here was no granulation tissue presented. That usually means there was no healing[.]" Dr. Silver explained that granulation tissue, or healing tissue, usually begins to form within 24 hours of the cut. *Id.* Thus, the only evidence of record establishes that the penile laceration was less than 24 hours old. Accordingly, it was inflicted at a time when Child

was not in Mother's care. Moreover, upon investigation, DHS concluded that Aunt, and not Mother, was the perpetrator of abuse and so noted in its CPS report. *Id.* at 19. The CPS report did not list Mother as a perpetrator of the abuse, by either commission or omission. *Id.* As Ms. Brown testified:

> Q. So [Mother] wasn't indicated [as a perpetrator of abuse] in the CPS report?
>
> A. No, she wasn't.
>
> Q. As a perpetrator of the abuse or as a perpetrator by omission, correct?
>
> A. That's correct.
>
> Q. **So, is it fair to say that DHS doesn't believe that [Mother] was involved in the abuse of [Child]?**
>
> A. **That's correct.**

*Id.* (emphasis supplied).[10] Notwithstanding the evidence presented at the hearing, the juvenile court concluded that "Mother was the perpetrator of the abuse because [Child] was in her care. Whether or not [Mother] inflicted the injuries directly was irrelevant." Juvenile Court Opinion, 5/17/12, at 7–8. In reaching this conclusion, however, the juvenile court conflates the elements required for adjudicating Child dependent under the Juvenile Act,

9. The juvenile court, as well as Appellee, point out that Mother, Aunt and Child stopped at Dunkin' Donuts on their way to the hospital. Juvenile Court Opinion, 5/17/12, at 3; Appellee's Substituted Brief at 8. Indeed, Ms. Brown, the DHS caseworker, testified during the dependency hearing that the DHS' report indicated that Mother, Aunt, and Child stopped at Dunkin' Donuts on their way to the hospital. N.T., 1/6/12, at 14. Ms. Kelly stated that she believed that she spoke to Aunt about this. However, when asked what the Aunt indicated, the juvenile court sustained Mother's counsel's objection and no further testimony was elicited regarding this event. *Id.* Although one could certainly take Mother to task for stopping at Dunkin' Donuts on the way to the hospital and such action may lend additional support for adjudicating Child dependent due to Mother's inability to care for him, this fleeting reference does not support any inference that Mother was somehow the perpetrator of abuse. Certainly, there was no testimony or evidence that the stop at Dunkin' Donuts caused Child any additional harm.

10. Ms. Brown did testify that there were some allegations in the GPS report that were substantiated regarding Mother's care of Child. However, those allegations involved Mother's lack of supervision over Child's medical care as evidenced by the diaper rash and lack of hygiene. N.T., 1/6/12, at 19, 20.

and the elements required for establishing child abuse under the Law.[11]

■ "In order to support an adjudication of dependency, the Juvenile Act does not require proof that the parent has committed or condoned abuse, but merely evidence that the child is without proper parental care." *In re R.P.*, 957 A.2d at 1211. Moreover, "[i]n determining whether there exists proper care, acts and omissions of a parent must weigh equally since parental duty includes protection of a child from the harm others may inflict." *Id.* at 1211–12. There is no question that Mother failed to provide Child with proper care and that the juvenile court properly adjudicated Child dependent under the Juvenile Act. Mother concedes that point. However, the juvenile court erred in relying on evidence that Mother failed to provide proper care to Child in finding Mother was the perpetrator of abuse. The juvenile court noted that Child suffered physical neglect and lacked adequate supervision as evidenced by the yeast infection and diaper rash. Juvenile Court Opinion, 5/17/12, at 7. The court also relied on the testimony that the bruises on Child's cheeks were inflicted injuries that were anywhere from one to six days old. *Id.* Yet, as already discussed, the diaper rash and bruises, although sufficient to establish Mother's inability to care for Child and to warrant an adjudication of dependency under the Juvenile Act, do not constitute child abuse as defined by the Law. In other words, although the evidence supports the findings that 1) Child was "without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals," 42 Pa.C.S.A. § 6302; 2) Mother was responsible for said lack of adequate care or control; and 3) Child was therefore dependent under the Juvenile Act, said findings do not support the conclusion that Mother was the perpetrator of the child abuse as defined by the Law.

Binding precedent establishes that the presumption created in § 6381(d) of the Law applies if it is clear that the caretaker in question was responsible for the supervision and control of the child **at the time of the abuse**. *In re J.G.*, 984 A.2d at 548. In the instant case, the only one of Child's injuries that meets § 6303's criteria for child abuse is the penile laceration. The evidence of record establishes that Child was not under the supervision or control of Mother at the time of the injury, therefore, it cannot be presumed under § 6381(d) that Mother was the perpetrator of the abuse. In fact, the evidence more than rebuts the presumption. It conclusively establishes that Child was not with Mother at the time of the injury and, therefore, Mother could not have perpetrated the abuse.

Although the record is completely devoid of evidence that Mother was the person who inflicted the laceration on Child's penis, Appellee argues that Mother should be held responsible for the actions of those she assigned to care for Child, presumably Aunt who was caring for Child at the time the injury occurred. Appellee's Substituted Brief at 26. Yet, there is no evidence of record that Mother knew or had reason to believe that Aunt, or anyone else, would

---

11. The purpose of the Law is to bring about quick and effective reporting of suspected child abuse so as to serve as a means for providing protective services and to prevent further abuse. *In re J.R.W.*, 631 A.2d at 1021. "The Law was created primarily for reporting suspected child abuse, providing the means for doing so and establishing the persons responsible for reporting the abuse[.]" *Id.* at 1022. The Juvenile Act, on the other hand, "is a procedural act which establishes jurisdiction in the courts to legally intervene and make findings of dependency[.]" *Id.*

inflict such abuse upon Child. As such, the record does not support a finding that Mother is responsible for Child's abuse through omission.

Appellee cites to a number of cases as support for the argument that Mother should be found to have perpetrated the abuse even if there is no evidence that Child was with Mother at the time the injury was suffered. However, the cases cited by Appellee are clearly distinguishable from the case *sub judice*.

In *In re J.R.W.*, the evidence established that the child suffered life-threatening injuries as a result of shaken baby syndrome "while in the care and custody of her parents." 631 A.2d at 1021. Although the trial court was unable to determine whether one or both of the child's parents perpetrated the abuse, the injuries were sustained "while in her parents' care." *Id.* Thus, the presumption established by § 6381(d) of the Law was met as "the primary custodians **during the time of the abuse** were the parents[.]" *Id.* at 1025 (emphasis supplied). In the instant case, the only evidence of record established that Child was not in the care of Mother at the time of the injury.

In *In re Frank W.D.*, 315 Pa.Super. 510, 462 A.2d 708 (1983), the issue was not whether the mother was the perpetrator of abuse, but rather whether the child had suffered abuse. In that case, the child suffered a fractured left arm. The child's babysitter testified that, while carrying the child, he lost hold of the child and the child fell from his arms. The babysitter said he caught the child by the arm before the child hit the floor at which time he heard something snap. A doctor testified that the injury to the child could not have occurred in the way described by the babysitter. The trial court rendered a decision that the infant was an abused child and adjudicated the child dependent under the Juvenile Act. *Id.* at 710–11. In affirming the trial court's decision, this Court noted that the trial court found the babysitter was not credible, therefore, it remained unresolved as to who inflicted the injury on the child. *Id.* at 712.[12] However, this Court concluded that the child was without proper parental care necessary for his physical health and, therefore, the trial court did not err in adjudicating the child dependent and ordering the child removed from the home. *Id.* Moreover, this Court noted that the affirmance of the trial court's order did not constitute a permanent order and that the mother could institute future proceedings to recover her child should she establish that her parenting skills and abilities improved. *Id.*

In *In re J.O.V.*, 454 Pa.Super. 630, 686 A.2d 421 (1996), the issue before this Court was whether the trial court abused its discretion in finding the child to be dependent and removing the child from his home. Like *In re Frank W.D.*, the issue was not whether the trial court erred in

---

12. In Appellee's brief, Appellee misquotes language from *In re Frank W.D.* Specifically, Appellee states that this Court found that "[Because Mother offered no credible testimony], it remain[ed] unresolved as to who inflicted the injury on the child and when it occurred." Appellee's Substituted Brief at 24, *quoting In re Frank W.D.*, 462 A.2d at 712. That is not what this Court stated. Instead, the actual quote is "since the hearing judge found [the babysitter's] testimony to lack credibility, it remains unresolved as to who inflicted the injury on the child and when it occurred." *In re Frank W.D.*, 462 A.2d at 712. We note this misstatement because throughout Appellee's brief and during oral argument, Appellee argues that Mother failed to testify at the dependency hearing or present any evidence to establish that she was not responsible for the abuse inflicted on Child. We remind Appellee that the burden of proof to establish dependency under the Juvenile Act and child abuse under the Law is not on Mother but on DHS and/or Appellee.

finding a particular parent to have perpetrated child abuse, but whether the trial court erred in adjudicating the child dependent and removing the child from the home. This Court looked to the medical evidence that established the child was seriously wounded on at least two occasions when he sustained bone fractures that the parents could not explain. Based on the medical evidence and the parents' inability to satisfactorily explain the injuries, this Court concluded that the trial court properly found that the child was without proper care and supervision. Hence, the trial court did not err in finding the child to be dependent under the Juvenile Act.

Finally, in *In re R.P.*, an 18 month-old child was brought to the hospital by his parents in critical condition. The medical evidence established that the child had over 100 bruises at various stages of healing all over his body, a skull fracture, healing cuts on his scalp, a subdural hematoma, a healing wrist fracture, and a possible hip fracture. 957 A.2d at 1208. Medical tests concluded that the child was suffering from battered baby syndrome. *Id.* at 1209. Mother told police that she last bathed the child that morning and did not observe any bruises, although she later testified that she would notice bruises on the child after father took care of him that were not there before father cared for him. *Id.* at 1209 and 1213. Father said he was jumping on a trampoline with the child when the child fell resulting in the injuries. *Id.* at 1209. Mother also told police that the child would slip down the stairs every once in a while and that he was a typical, clumsy toddler. *Id.* Following a lengthy evidentiary hearing, the trial court adjudicated the child and his brother dependent and found aggravated circumstances warranting a cessation of reunification efforts. In affirming the trial court, this Court cited to the extensive record, including conflicting statements by mother, and an abundance of medical evidence, to conclude that mother had to have known that the child was being abused and that she failed to act on her knowledge. As this Court noted:

> While the trial court found that it was [f]ather who inflicted [the child's] August 26, 2007 injuries, it also underscored that it [was] impossible to determine which parent caused [the child's] 100 bruises or his old healing wrist fracture.... Accordingly, even if [m]other did not inflict a single bruise, the [b]attered [b]aby [s]yndrome suffered by [the child] would not have occurred but for [m]other's omissions as his primary caretaker. Mother, on a daily basis, changed [the child's] diapers, clothed him, and bathed him; he was jointly in her care and [f]ather's care on August 23, 24, 25, and 26, 2007. Mother continued to observe bruises on [the child's body], especially after being in [f]ather's care, yet she did nothing to protect the child.

*Id.* at 1218. The factual record in *In re R.P.* is vastly different from the record before us. The record in *In re R.P.* was replete with testimony regarding life-threatening and severe injuries suffered by the child over a period of time while in the direct care of mother and father. It also supported a finding that mother knew or should have known that father was harming the child, yet she took no action to prevent further harm. Such is not the case at hand.

We have no doubt that Child was without proper care or control necessary for his physical health and well-being and that Mother was unable to care for Child. We also have no doubt that someone inflicted serious abuse on Child in lacerating his penis. Yet, we cannot conclude that the record supports a finding that Mother was

the perpetrator of child abuse, as that term is expressly defined by the Law. Hence, we vacate the juvenile court's finding that Mother is a perpetrator of child abuse.

Order affirmed in part and vacated in part. Jurisdiction relinquished.

PANELLA, J. files a dissenting opinion in which BENDER, P.J. and WECHT, J. join.

## DISSENTING OPINION BY PANELLA, J.

I respectfully dissent from the decision of my distinguished colleagues in the Majority. My discussion will be restricted to the Majority's reversal of the trial court's finding that Mother, L.F., should be identified as a perpetrator of abuse. I believe sufficient evidence exists to list Mother, who was the primary caretaker, as a perpetrator of the brutal child abuse inflicted upon L.Z.

Instead of viewing each of Child's injuries in isolation to ascertain whether he suffered a "serious physical injury" necessary to establish child abuse, I would focus on the totality of Child's injuries to make this determination. This form of analysis is consistent with well-established precedent in Pennsylvania.

At the hearing held on January 6, 2012, before the Court of Common Pleas of Philadelphia, Family Court Division—Juvenile Branch, there was strong, undisputed expert testimony provided by Dr. Deborah Silver, the Medical Director of the Pediatric Inpatient Unit at the CHOP Pediatric Care Network, Abington Memorial Hospital.[1] Not only did Dr. Silver review Child's records, she personally examined Child, at the request of the emergency room physician, not long after Child was presented at the hospital's emergency room.

With this in mind, I would find that the cumulative effect of Child's penile laceration, cheek bruising, and severe diaper rash resulted in severe pain sufficient to support a finding of child abuse pursuant to Section 6303(b)(1)(i) or (b)(1)(iii). 23 PA. CONS.STAT. ANN. § 6303(b)(a)(i), (iii).[2] Furthermore, the record, in my view, substantially supports the trial court's conclusion that Mother should be identified as a perpetrator.

I do not read Section 6381(d) to require the agency to prove Mother was present at the time of Child's injuries because such a requirement is inconsistent with the prima facie standard. *See* 23 PA. CONS.STAT. ANN. § 6381(d). That section provides, in pertinent part:

### § 6381. Evidence in court proceedings

. . .

**(d) Prima facie evidence of abuse.—** Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the **acts or omissions** of the parent or other person responsible for the welfare of the child **shall be prima facie evidence** of child abuse by the parent or other person responsible for the welfare of the child.

*Id.* (emphasis added).

The reason for the prima facie standard in determining the identity of an "abuser," rather than the higher standard of clear and convincing evidence to prove whether

---

1. Dr. Silver is also board certified in pediatrics.

2. Dr. Silver testified that the injuries were consistent with a "pattern" of child abuse.

N.T., 1/6/12, at 47. In fact, Dr. Silver admitted the child into the hospital because "we were very concerned about child abuse and we took him into custody." *Id.* at 51.

a child has been abused, has been well established by our Court:

> This lessened standard of establishing abuse by the caretakers ... has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases. **Prima facie evidence** is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; **it is the standard by which the court determines whom the abuser would be in a given case.** There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse.

*In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1024 (1993) (emphasis added). The panel continued:

> The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that **prima facie evidence the custodian has caused the injury, either by acts or omissions, is all that is required.** We find no defect in this reasoning. Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus the legislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

*Id.* (emphasis added).

This Court further refined the prima facie evidence standard for the identity of abusers in *In re R.P.*, 957 A.2d 1205 (Pa.Super.2008). In *In re R.P.*, the mother argued on appeal that she had not caused the serious injuries to her children, but that rather it was the father who was the perpetrator, and therefore she should not have been found to be an abuser in the underlying dependency matter. Our Court affirmed the trial court's decision that the mother was a perpetrator by omission. The panel explained that in determining whether the mother was properly found to be a "perpetrator by omission of ... abuse", the **omissions** as well as the **actions** of a parent must "weigh equally since parental duty includes protection of a child from the harm others may inflict." *Id.* at 1212.[3]

The case presently before us is the exact type of case which demonstrates the Legislature's wise decision to establish the prima facie standard; a case where horrendous child abuse is inflicted, but none of the adults providing supervision for the child account for the time periods during which the abuse occurred. Our Court, in

---

**3.** Our sister court, the Commonwealth Court of Pennsylvania, has also acknowledged this lower standard of evidence, as well as the legally permissible finding that an "omission" can support a finding of abuse against a parent:

> In dependency proceedings ... the county agency first has the burden of establishing through clear and convincing evidence that a minor was abused, but then need only prove the identity of the perpetrator by prima facie evidence ... The Superior Court has defined the prima facie standard in dependency cases as a mere presumption "that the abuse normally would not have occurred except by reason of acts or omissions of the parents." *In re R.P.*, 957 A.2d 1205, 1218 (Pa.Super.2008)(quoting *In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1024 (1993)).

*C.S. v. Department of Public Welfare*, 972 A.2d 1254, 1259 (Pa.Cmwlth.2009), *appeal denied*, 604 Pa. 708, 987 A.2d 162 (2009).

*In re J.G.*, 984 A.2d 541 (Pa.Super.2009), *appeal denied*, 605 Pa. 715, 991 A.2d 313 (2010), explained the necessity for Section 6381 in a scenario such as is presented here, where there is an apparent conspiracy of silence regarding care of the abused child:

> Under 23 Pa.C.S.A. § 6381(d), a person is an abuser if it is established that the child suffered a particular type of harm, namely "of such nature as would ordinarily not be sustained or exist except by reason of the acts or omissions," and the person is proved to have had responsibility "for the welfare of the child" at the time of injury. *Id.* The statute eases the burden of proof by providing for a presumption on the basis that the parent and/or person "was responsible for the welfare of the child" at the time the abuse occurred.
>
> In interpreting 23 Pa.C.S.A. § 6381(d), we decline to read the phrase, "by the parent or the other person," as a disjunctive clause mandating strict proof of either one or the other for the presumption to apply. Rather, to effectuate the underlying intent of the statute and preserve the health and welfare of the child, we find that the phrase, "by the parent or the other person," is a term simultaneously encompassing **both the singular and the plural.** Stated differently, proof of the nature of the child's harm, alone, **is prima facie evidence of child abuse by anyone and/or all** who are found to be "responsible for the welfare of the child" during the time of the alleged injuries. *See In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019 (1993) (affirming trial court's order finding that either or both of the parents abused the child).
>
> Where the trial court ·finds that based upon the evidence, it is unable to determine which parent(s) or person(s) "assumed responsibility for the welfare of" child at the time of the injury, the viability of the presumption in 23 Pa.C.S.A. § 6381(d) is questionable. In these factual scenarios, it would be illogical to require CYS to prove, and the trial court to find, that either one or the other of the alleged perpetrators committed the abuse as a prerequisite to finding that a child was abused and declaring the child dependent. There is no statutory provision in the Child Protective Services Law or the Juvenile Act to suggest that the trial court must make a specific finding as to which caretaker perpetrated the abuse in order to adjudicate a dependent. Indeed, these are two separate inquires. In *In the Interest of J.R.W.*, 428 Pa.Super. 597, 631 A.2d 1019, 1024 (1993), a panel of this Court explained:

> Th[e] lessened standard of establishing abuse by the caretakers, coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases. Prima facie evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case.

*Id.* at 547 (emphasis added).

While Mother's counsel argues that Mother had not seen Child for the two days prior to Child being taken to the emergency room, there is ample support in the record for the trial court's finding that Mother consistently cared for Child, and Child consistently resided with Mother.[4]

---

4. Dr. Silver testified that the penile laceration was a "fresh wound." N.T., 1/6/12, at 45.

*See* Trial Court Opinion, 5/17/12 at 2. The trial court's decision is exactly in line with our decision in *In re J.G., supra.* Without altering the burden of proof, it cannot be ignored that the persons who had the responsibility for the welfare of L.Z. did not provide any sworn evidence at the hearing as to who in particular had responsibility for L.Z. during the time of the penile laceration.[5] Therefore, while she may or may not have been present when some of the injuries occurred, it was Mother's failure to properly care for and protect Child which necessitates that she be listed as a perpetrator.

While the Majority declines to view this fact as relevant, Mother's oversight, or actual infliction of abuse, was on full display based upon the undisputed evidence regarding the child's penile laceration. The penile laceration was extremely serious and painful, which Dr. Silver described as follows:

> The concern about the—penile laceration is an extremely uncommon presentation for a child of this age. The laceration was on the underside of the penis. It was from approximately 5:00, 6:00 p.m. to about 11:00 p.m., on the clock. It was very deep. It was linear. There were no signs of healing yet. There were no jagged edges. There were no other signs of cuts or other marks indicating cuts in the area, it was a single laceration.
>
> It required surgical repair with generalized sedation for the child. . . .

N.T., 1/6/12 at 37. When asked if the penile laceration would have caused Child to suffer "severe pain" Dr. Silver answered, "Absolutely." *Id.* Dr. Silver testified that she could not surmise any possibility that the injury had been accidental. *See id.* at 38.[6] No one gave Dr. Silver any plausible explanation as to how this serious injury could have occurred. *See id.* at 39–40.

The trial court found that Mother and her sister stopped at Dunkin Donuts while Child was suffering from this severe penile laceration.[7] The pair stopped while on the way to the hospital to seek treatment for Child's bleeding penis. Such clouded decision-making, when combined with the trial court's findings, evidences a dereliction of parental duties sufficient to support a find-

---

The record reflects, in many places, that Mother was present when L.Z. was brought into the emergency room, which was, according to Dr. Silver, probably within 24 hours of when his penis was intentionally cut, although it could have been even less time. Although Mother argues on appeal that she was not the actual perpetrator of this abuse, and that she had not seen L.Z. for the two prior days, she did not testify at the hearing.

5. Mother's counsel relies upon an unsworn comment that Mother made to a caseworker. Although Mother's contention is to place blame on her sister for the abuse, Mother's sister did not testify or attend the hearing, and Mother did not testify under oath that it was her sister who cut Child's penis.

6. A color photograph of the cut to L.Z.'s penis, taken upon his presentation at the emergency room, was admitted into evidence at the hearing. This photograph demonstrates the monstrosity of the abuse inflicted upon Child. It is only due to a sense of decorum that I do not attach a copy of the photograph to this Dissent.

7. At the hearing held on January 2, 2012, counsel for Mother objected to testimony about the trip to the emergency room because it had not been raised in the Dependency Petition. The trial court correctly concluded that this objection was unfounded because the Dependency Petition, in paragraph "B," specifically referenced by the witness, Kelly Brown, a DHS intake worker, included the allegation: "[Mother] and [Mother's sister] stopped for coffee and donuts prior to going to Abington Hospital despite the severity of [L.Z.'s] injury." N.T., 1/6/12, at 14–16.

ing that Mother is a perpetrator of child abuse by actions or omission.

Even considering the Majority's isolation of each occurrence of abuse, the evidence establishes, on a prima facie basis, that Mother knew of the injuries to Child and did nothing to protect the child, and was, in fact, present for at least one of Child's injuries: the cheek bruising.

Dr. Silver opined that the cheek bruising is a common abuse injury that is caused by "[a caretaker] grabbing the face and squeezing it between their fingers and planting their thumb in the cheek." N.T., 1/6/12, at 42. While Dr. Silver did not explicitly state that the injury caused Child severe pain, her explanation was the equivalent of such a statement in a colloquial sense:

Q. You indicated that [Child] also had bruising to his face, is that correct?

A. Yes. He had quite apparent bruising on the surface of his cheeks.

Q. And, when you say quite apparent, can you be a little more descriptive?

A. They were very dark. He had a large bruise that was several centimeters large in the meat of his right cheek, in the buckle area, as well as on the left cheekbone. And they were clearly on opposite sides of the face.

Q. Why is that concerning about them being on opposite sides of the face?

A. Generally, when children fall and get bruises or injuries to their face, they fall and hit boney prominences. So, they frequently get what people refer to as like an egg on their forehead. They will hit the orbital area, so they will bang around the orbit. The cheekbone injury could have been potentially from banging against it. The buckle injury is something we [call] pathopneumonic or an inflicted injury. It is very hard to

land directly on something unless you actually landed on like a very sharp, pointy implement. Or to injure, to bruise, the cheekbone would take the hit or the jaw would take the hit but not the meat of the cheek. And, this kind of injury is something that we learn about that is usually caused, these bilateral injuries, by someone grabbing the face and squeezing it between their fingers and planting their thumb in the cheek. And that is a common abuse injury we do see.

Q. And, Doctor, at the time that would occur would that cause a child severe pain?

A. I am sure that it couldn't have been very comfortable.

Q. And, at the time that [Child] presented on December 3rd, are you able to estimate approximately how old the bruises were?

A. They weren't immediate because bruising usually takes at least about a day or so, hours to days to form, and they weren't healing. You cannot age bruises. No doctor will ever tell you they can age a bruise. So, it looked reasonably recent, but I can't tell you what it was exactly. So, it was probably more than a day and less than a week, and that's about as good as I can get. *Id.* at 40–42.

Dr. Silver also indicated that Mother's explanation regarding the bruising—that Child fell onto a table—was inconsistent with this type of injury. *See id.* at 52. This evidence also satisfies the prima facie burden of Section 6381(d) by showing that Mother knew of abusive conduct inflicted upon L.Z. but did nothing to protect him, possibly inflicting the abuse herself.

Lastly, the necessary findings to establish Mother as a perpetrator were made by the trial court. On appeal, "[o]ur scope of review in child dependency cases is limited

in a fundamental manner by our inability to nullify the fact-finding of the lower court." *In re J.G.*, 984 A.2d at 546 (citation and internal quotation marks omitted). Our role as an appellate court requires us to accept the findings of fact and credibility determinations of the trial court in a dependency case. *See In re J.J.*, 69 A.3d 724, 728 (Pa.Super.2013). It has long been held that we should accord great weight to the hearing judge's findings of fact because the trial judge is in the best position to observe and rule upon the credibility of the witnesses. *See Matter of Read*, 693 A.2d 607, 610 (Pa.Super.1997), *appeal denied*, 555 Pa. 708, 723 A.2d 1025 (1998).

The trial court made the following findings after a full hearing at which Mother was represented, and at which the court had a full opportunity to see and hear the witnesses and make credibility decisions:

> The Court found clear and convincing evidence that the Child was without proper parental care. The Child suffered from bruises to both his left and right cheeks, a penis laceration, and a significant diaper rash. Mother's explanation for the rash was inconsistent with the location. Mother's explanation for the bruises on the Child's face was also inconsistent with the injuries. Dr. Silver testified that the penis laceration was non-accidental in nature. Dr. Silver concluded that the Child was the victim of child abuse. The Child consistently resided with Mother. Therefore, the Court found that Mother failed to provide proper parental care and failed to protect the Child. The Child's injuries would not have occurred but for Mother's omissions as his primary caretaker.

Trial Court Opinion, 5/17/12 at 7 (citations to the record omitted). Moreover, after examining the Juvenile Act and correctly summarizing the standard of review, the trial court concluded:

> [T]he child suffered physical neglect and lacked adequate supervision due to the fact that he suffered from an untreated yeast infection and diaper rash from being in urine for extended periods of time.[8] The Court heard testimony that the Child consistently resided with Mother. The Court heard testimony that the very deep penile laceration was a "non-accidental trauma." The Court also heard testimony that the bruises on the Child's cheeks were inflicted injuries. The injuries would be caused by someone grabbing the face and squeezing it between their fingers. The bruises looked as if they had been there anywhere from one to six days. Mother claimed to not have seen the Child in at least two days, and provided an explanation that was not consistent with the injuries. Based on those facts, the Court determined that Mother was the perpetrator of the abuse because the Child was in her care. Whether or not she inflicted the injuries directly was irrelevant. She failed to act and protect the Child from the serious physical injuries he suffered. The medical evidence established that the Child's injuries were consistent with child abuse.

*Id.* at 7–8 (citations to the record omitted; footnote added). All of the above findings are well established in the record.

Accordingly, because we can reject the factual findings of the trial court only if they are not supported by competent evi-

---

8. The evidence establishes this was not an ordinary case of diaper rash; it eventually caused the Child to develop a yeast infection. *See* N.T., 1/6/12, at 43. Based on the location of the rash, Dr. Silver opined that it resulted from exposure to urine for extended periods. *See id.* The explanation provided by Mother was not compatible with the location of the severe diaper rash. *See id.* at 42–43. *See also* Trial Court Opinion, 5/17/12 at 4.

dence, there is no reason to reverse the decision of the knowledgeable trial court judge. As such, because the trial court's findings are supported by competent evidence, and for all the reasons stated above, I would affirm.