J-A03035-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J.B., MOTHER | No. 1347 MDA 2014 |

Appeal from the Order entered July 8, 2014,
in the Court of Common Pleas of Union County
Juvenile Division, at No(s): CP-60-DP-0000008-2013

BEFORE: MUNDY, STABILE, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:　　　　　　　　**FILED JUNE 02, 2015**

Appellant, J.J.B. ("Mother"), appeals from the order entered in the Union County Court of Common Pleas, granting Union County Children and Youth Services' ("CYS") motion for a finding of aggravated circumstances with respect to her child, J.D. ("Child"), born in August of 2013.　Mother argues the court erred in: (1) finding aggravated circumstances against her, where the evidence showed two other adults were also responsible for Child and were each alone with him when the abuse occurred; and (2) directing that no efforts to reunify Child with Mother be made.　We affirm.[1]

---

\* Former Justice specially assigned to the Superior Court.

[1] While this appeal was pending, the trial court provided to this Court a permanency review order, dated March 3, 2015, which indicated both Mother and the child's father, R.D. ("Father") signed consents to adoption.　On March 31st, this Court directed all parties to explain whether this appeal should be dismissed as moot.　In response, Mother, Father, CYS and the Guardian *Ad Litem* each cogently contended that a finding of aggravated circumstances against Mother in this matter may detrimentally affect her in any future dependency matter with another child.　We agree with this reasoning and thus do not find this appeal moot. ***See In re M.B.***, 101 A.3d 124, 127 (Pa. Super. 2014) (stating this Court will decide questions that

The trial summarized the underlying facts, which were largely not in dispute, as follows. *See* Trial Ct. Op., 7/8/14, at 2-5.

> [T]he parents and [C]hild resided [in] Mifflinburg, Union County, Pennsylvania[,] in an apartment owned by [F]ather's mother [("Grandmother"),] who lived in the apartment above the parents. At all times relevant to these proceedings [F]ather was laid off from his employment[, could not drive,] and was at home[,] and [M]other was unemployed and the primary caregiver of the child. Occasionally [Grandmother watched] the child . . . for three (3) hours so that the parents would have time alone. These periods . . . would occur after she [got] off work, approximately 5:00 or 6:00 P.M. in the evening.
>
> On October 8, 2013, [when Child was approximately seven weeks old, G]randmother had the child from approximately 6:00 P.M. to 9:00 P.M. [S]he observed that the child was a little fussy, [but] did not observe any bruising or any other type of marks on the child nor . . . any other kind of unusual behavior.
>
> On October 9, 2013, [G]randmother . . . went down to get [Child] at approximately 5:00 P.M. [G]randmother went into the parent[s'] apartment and both parents were present. Sometime after that one of the parents brought the child up to [G]randmother's apartment.
>
> When [G]randmother took the child he was fussy and he did not want to be put down. She fed him a bottle of formula and she noticed a scratch on his forehead and that his right arm was moving. She described it as "twitching". Because he was fussy, she thought that he may have had a soiled diaper and when she [changed] the diaper she observed that his scrotum was "black and blue". [This and the mark on his forehead] were new observations to [G]randmother from the preceding evening so she immediately summoned [F]ather to her apartment.

otherwise have been rendered moot when, *inter alia*, party to controversy will suffer some detriment due to trial court's decision).

After [F]ather came into [G]randmother's apartment she advised him that the child needed to be taken to the emergency room because there was something wrong with the child.

[F]ather returned to [his] apartment and after approximately fifteen (15) minutes[, G]randmother went downstairs[. F]ather told [her] they were not going to take the child to the emergency room. [M]other told [G]randmother that [they just took] the child to the doctor and she saw no reason to take the child to the doctor.

[G]randmother was upset and threatened that if they did not take the child[,] she was going to. Later [F]ather texted her and said [M]other would be taking the child to the emergency room.

At some point [G]randmother confronted [M]other about the mark on the child's head and [M]other explained that the mark came from an injury caused by the family dog.

After [G]randmother dropped the child off and said the child needed to go to the hospital, [M]other packed the child's things . . . , put him in the car seat and told [F]ather she was taking him to the hospital. Shortly after leaving she [returned], saying that she was not going to take the child to the hospital because she was not going to allow [G]randmother . . . tell her how to raise her kid or what was wrong with him.

Later that evening [F]ather was responsible for the child's care, gave him a bath, fed him and changed his diaper. He put the child in a bassinet and went out to the couch and fell asleep.

The next day, October 10, 2013, [M]other took the child to the family doctor. Father did not accompany her. [F]ather observed the child to still be fussy and crying[,] and stated "we knew something was wrong with him and I told her, we have to take him to the hospital. She has to take him to the hospital." [F]ather did observe that the child's scrotum was black and blue and that he had small bruises at different locations and a cut on his head.

[F]ather was asleep when [M]other took the child to the family doctor[,] and after she woke him up to tell him she was going to the doctor[,] he went back to sleep. He was later awoke[n] by a telephone call from [M]other to advise him that she was taking the child to the emergency room because the child was having seizures.

Trial Ct. Op., 7/8/14, at 2-4.

"The child was admitted to Geisinger Medical Center . . . on October 10, 2013 and examined by Dr. Paul Bellino," a pediatrician with the Janet Weis Children's Hospital. *Id.* at 5; N.T. Adjudic. H'rg, 11/20/13, at 5. At the dependency hearing, CYS presented Dr. Bellino both as a fact and expert witness in pediatric medicine. *See* N.T., 11/20/13, at 8. Mother presented Lori Frasier, M.D., a pediatrician at Penn State Hershey Children's Hospital, as an expert in the area of child abuse and neglect. N.T. Adjudic. H'rg, 3/17/14, at 17.

There was complete agreement by the experts on the extent of the injuries.

. . . The child had [approximately twenty-five] bruises over his head, all of his extremities and his back. . . . The child suffered from a high parietal skull fracture[, and] bleeding around the brain and the subdural region mostly on the right side but some bleeding also on the left.

The child had abnormal liver function and suffered from a significantly fractured liver. It was this injury that caused blood to spill out of the child's liver and into his abdomen and then down to his testicles.

Finally, the child suffered from . . . rib fractures of the 5th, 6th and 7th ribs on the right side and fractures of the 3rd, 4th, 5th, 6th and 7th ribs on the left side.

**Given the extent of the child's injuries, delay in**

- 4 -

> **taking the child to the hospital had put him at risk for even greater INJURY OR DEATH.**
>
> It is unlikely that the extent of the child's injuries came from one (1) single blunt force but was the result of multiple blows. This is indicated given the location of all of the injuries from the head down to the abdominal area. It is clear the injuries were inflicted by blunt force trauma. There is absolutely no doubt based on the expert testimony that the injuries suffered by the child were severe and life threatening. A delay in seeking treatment exposed the child to death or even greater serious bodily injury.
>
> The experts disagreed as to the timing of the injuries. Although both pediatricians testified that some of the injuries may lead to evidence of timing of the injury, both agreed that the timing could not be precise. However, it was clear from the testimony of both physicians that it is not only possible but likely that the injuries occurred between the October 8 and October 10 time frame when the child was in the care of the mother and the father.

Trial Ct. Op. at 5-6 (emphasis in original).

Finally, the court stated:

> During the entire period of time of October 8th to the 11th, the relevant time period of these events, [F]ather was not working and was home[. F]ather, however, did not have a valid operator's permit to drive a motor vehicle. Although [M]other [later] indicated to law enforcement that [F]ather was never alone with the child, it appeared, based on [F]ather's testimony, there were times that he did provide the care for the child while [M]other was sleeping but still in the residence.

*Id.* at 4.

On October 15, 2013, CYS filed a dependency petition and a motion for a finding of aggravated circumstances against Mother, alleging Child was a victim of physical abuse resulting in serious bodily injury or aggravated

physical neglect. CYS did not file a motion for aggravated circumstances against Father or Grandmother. On October 18th, CYS took custody of Child pursuant to a shelter care order. The trial court conducted hearings on November 20, 2013 and March 17, 2014.[2] "In addition, a transcript from a preliminary hearing held before [a Magisterial] District Judge [on March 4, 2014,] was incorporated into the record by stipulation of the parties." Trial Ct. Op. at 1. On June 2nd, the court adjudicated Child dependent.[3] On July

---

[2] The trial court noted:

> At the hearing on March 17, 2014 both parties stipulated . . . that they were both incarcerated. . . . Mother [was] incarcerated for an indefinite period of time . . . . Father [was] incarcerated until at least July 27, 2014[;] however, he [was] facing probation revocation proceedings in Union County and is not guaranteed to be paroled on his eligibility date.

Trial Ct. Op. in Support of Finding of Dependency, 6/2/14, at 2.

[3] The Juvenile Act defines a "dependent child" as, *inter alia*, a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302(1).

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*In re D.A.*, 801 A.2d 614, 617 (Pa. Super. 2002) (*en banc*) (some citations omitted).

8th, it entered the underlying order finding aggravated circumstances against Mother and directed that CYS was not required to make efforts to reunify Child with Mother. Mother timely appealed and filed a concise statement of errors complained of.

In her statement of questions, Mother raises four issues. We first address the second—whether the trial court erred in finding CYS "did not have to provide services to" her when it "was going to provide services to . . . Father, who was also a caretaker of the minor child when the abuse in question happened." Mother's Brief at 9. As stated above, Mother consented to the adoption of Child. Accordingly, she has waived any claim that CYS should continue to provide reunification services to her. *See Interest of L.Z.*, ___ A.3d___, ___, 2015 WL 1332597 at *3 n.4 (Pa. Mar. 25, 2015) ("*L.Z.*") (holding challenge to court's finding that DHS need not make reasonable efforts at reunification was waived by mother's voluntary relinquishment of her parental rights).

Mother's remaining three issues overlap and we address them together. She does not challenge the trial court's determinations that Child is dependent and that he suffered child abuse. Rather, Mother's arguments relate to the identity of the perpetrator of the abuse; she avers the court erred in finding she was the perpetrator. Mother asserts there were three caretakers—herself, Father, and Grandmother—who "were responsible for [C]hild at the time . . . he was injured," and that they each "had periods of

time alone with [C]hild with no one else present." Mother's Brief at 25. Mother alleges "[i]t is unclear and unsupported that [she] had any idea of the situation or the nature and exten[t] of [C]hild's injuries." *Id.* at 25, 34, 35 ("[T]he testimony shows that it would be difficult, if not impossible, for [M]other to know the nature and extent of [C]hild's injuries."). Nevertheless, Mother avers Father and Grandmother could have taken Child to the hospital but did not, and that she, Mother, "alone fulfilled her duty to [C]hild by taking" him to the hospital. *Id.* at 35. She also maintains she "had consistently seen to [C]hild's medical care," as she had taken Child to a regular check-up on October 1, 2013. *Id.* at 25. Finally, she argues the court abused its discretion in finding Grandmother's testimony credible. We find no relief is due.

We note the relevant standard of review:

> "[T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law."
> We review for abuse of discretion[.]

*L.Z.*, 2015 WL 1332597 at *7 (citations omitted). "We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence." *In re J.C.*, 5 A.3d 284, 287-88 (Pa. Super. 2010) (citation omitted). "[T]he focus of all

dependency proceedings . . . must be on the safety, permanency, and well-being of the child." *In re A.K.*, 936 A.2d 528, 534 (Pa. Super. 2007).

Section 6431(c.1) of the Juvenile Act provides:

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S. § 6341(c.1).

The Juvenile Act defines "aggravated circumstances" to include circumstances in which "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302. The Act defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.* "Aggravated physical neglect" is defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

"As part of the dependency adjudication, a court may find a parent to

- 9 -

be the perpetrator of child abuse . . . ."[4]  **L.Z.**, 2015 WL 1332597 at *9.  At the time of the trial court's underlying decision, Section 6303(b) of the Child Protective Services Law[5] ("CPSL") defined "child abuse" to include "[a]ny recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age."  23 Pa.C.S. § 6303(b)(1)(i).

We find the facts in this matter, as well as the issue on appeal, analogous to those in the recent decision of **L.Z.**  At the time the trial court adjudicated Child dependent and found aggravating circumstances against Mother, only the Superior Court *en banc* decision in **L.Z.** was issued.  **See In re L.Z.**, 91 A.3d 208 (Pa. Super. 2014) (*en banc*).  We summarize that holding, as well as our Supreme Court's reversal of the *en banc* decision.

In **L.Z.**, the mother and her sister, the latter being the child's aunt, brought the twenty-one month old L.Z. to the hospital.  **L.Z.**, 2015 WL 1332597 at *1.  He had "a deep cut nearly halfway around the base of his penis[,]" a dark bruise on each cheek "above the jawbone and below the cheekbone," and "severe diaper rash and yeast infection on the front of his

---

[4] "If the court finds the parent to have perpetrated abuse, the relevant CYS agency would file with the Department of Public Welfare a 'founded report'[, **see** 23 Pa.C.S. § 6303(a),] which would trigger inclusion on the statewide ChildLine Registry," **see** 23 Pa.C.S. § 6331.  **L.Z.**, 2015 WL 1332597 at *9. Inclusion on the registry "restricts an individual's ability to engage in employment related to children."  2015 WL 1332597 at *3.

[5] The CPSL was amended, effective December 31, 2014, to broaden the term "child abuse."  **L.Z.**, 2015 WL 1332597 at *2 n.3.

body." *Id.* (emphasis removed). The two sisters lived and cared for the child together. *Id.* "[T]he presentation of these injuries was consistent with abuse and inconsistent with several explanations given by [the two women,] which led the treating physicians to suspect that the injuries were non-accidental." *Id.* Mother did not testify at the adjudicatory hearing, but "[a] caseworker testified [the m]other acknowledged at the hospital that she and [the a]unt were [L.Z.'s] primary caregivers, but claimed that she had been staying with her paramour for the two days prior to the hospital visit," and L.Z. was with the aunt. *Id.*

The trial court found, *inter alia*, L.Z. was dependent and a victim of child abuse under Section 6303. *Id.* The court further found the mother was the perpetrator of abuse, where the "[c]hild's injuries would not have occurred but for [the m]other's omissions as his primary caretaker," whether "she inflicted the injuries directly was irrelevant," and "[s]he failed to act and protect the [c]hild from the serious physical injuries he suffered." *Id.* at **2-3. The court thus found aggravating circumstances against the mother. *Id.* at *2.

On appeal, an *en banc* majority of this Court vacated the abuse determination, holding, *inter alia*, the trial court erred in finding the mother was the perpetrator of abuse. *Id.* at *3. The *en banc* panel considered Section 6381(d) of the CPSL, "*Prima facie* evidence of abuse:"

> Evidence that a child has suffered child abuse of such a
> nature as would ordinarily not be sustained or exist except

- 11 -

by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

*Id.* (quoting 23 Pa.C.S. § 6381(d)).  The panel held this subsection did not "permit the court to designate a parent a perpetrator of abuse where the record fails to establish that the child was in the parent's care at the time of the injury."  *L.Z.*, 2015 WL 1332597 at *4.  The panel then credited the testimony that the "[m]other had not seen [L.Z.] for two days before [the a]unt told her that [the c]hild's penis was bleeding" and found "the injury 'was inflicted at a time when [L.Z.] was not in [the m]other's care.'"  *Id.* Three judges dissented from the majority.  *Id.* at **5-6.

L.Z.'s guardian *ad litem* successfully petitioned for allowance of appeal with our Supreme Court on, *inter alia*, the question of whether the Superior Court misconstrued the evidentiary presumption of Section 6381(d) and specifically, "whether the Superior Court erred in rejecting the trial court's determination that [the m]other perpetrated the abuse."  *Id.* at **6, 9.  The Supreme Court reversed the majority's decision, agreeing with the dissent. *Id.* at **1, 17.  The Supreme Court stated:

> While a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c) (recognizing clear and convincing evidence as the necessary standard for concluding that a child is dependent), the identity of the abuser need only be established through *prima facie* evidence in certain situations[.]

- 12 -

*Id.* at *8.  The Court found the Superior Court's interpretation of Section 6381(d) would "require[e] a CYS agency to prove that, at the moment of injury, the parent or caregiver was physically present and that no other adult was responsible for the child."  *Id.* at *9.  The Court found this interpretation essentially "[wrote] the statutory mandated presumption out of the law."  *Id.*  The Court opined:

> [In dependency proceedings, the Juvenile Act] generally require[s] CYS agencies to meet a relatively high standard of proof, demanding . . . clear and convincing evidence to find a child dependent . . . .   The Legislature, however, carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child."  23 Pa.C.S. § 6381(d).  To read this section as only applying when one parent or one responsible person is present would so restrict its applicability as to negate its existence.

*Id.* at *17.

In reaching this conclusion, our Supreme Court also considered:

> [C]hild abuse cases often involve a child presenting to a hospital with significant injuries that are entirely consistent with common types of child abuse and entirely inconsistent with the implausible explanations concocted by the parents and responsible persons to avoid allegations of child abuse.  As noted, in cases where multiple caregivers are involved, the individuals frequently "circle the wagons" or alternatively point fingers at each other.  As the children may be too young or fearful to describe the abuse, CYS agencies are left to prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons and the implausible statements of the parents and

- 13 -

responsible persons. Thus, while they can prove the existence of abuse rather easily, they have no ability to assign responsibility for the heinous act among the responsible adults. As Judge Tamilia observed in 1993, "the Legislature deemed it wise and necessary to establish a different evidentiary standard" by enacting Section 6381(d)'s presumption to avoid this evidentiary conundrum and protect children from future abuse. [*Interest of J.R.W.*, 631 A.2d 1019, 1023 (Pa. Super. 1993).] We emphasize that, when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child.

*Id.* at *18.

The Court further held the presumption was rebuttable by the parent:

Moreover, the Legislature balanced the presumption of Section 6381(d) by making it rebuttable as it merely establishes "*prima facie* evidence" that the parent perpetrated the abuse. 23 Pa.C.S. § 6381(d). As commonly understood, *prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." Black's Law Dictionary 825 (6th ed. Abridged 1991). Accordingly, evidence that a child suffered injury that would not ordinarily be sustained but for acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*Id.*

The Supreme Court found the mother failed to rebut the presumption by presenting evidence or testimony that L.Z. "was not in her care when the injuries were suffered and that she had no reason to question her decision to leave" L.Z. in the aunt's care.[6] *Id.* It held either the mother or the aunt "inflicted the abuse [L.Z.] suffered or failed to protect him from the other's abuse," and held that "ample, uncontested, unrebutted evidence existed for the trial court to presume that [the m]other perpetrated" the abuse. *Id.* at **18-19. Thus, the Court reversed the Superior Court's decision and reinstated the trial court's order, which found the mother abused L.Z. and which found aggravating circumstances against her. *Id.* at *19.

In the case *sub judice*, as stated above, only the Superior Court's *en banc* decision in *L.Z.* was published at the time the trial court considered CYS' petition for a finding of aggravating circumstances against Mother. The trial court's opinion cited the *en banc* majority's decision:

> [After establishing by clear and convincing evidence that a child is a victim of child abuse,] the Agency need only show prima facie evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers . . . . However, the Court is not permitted to designate a parent a perpetrator of abuse where the record fails to establish that the child was in the parent['] s care at the time of the injury. Where the record is unclear as to which parent or person was

---

[6] The Court stated that the mother's and aunt's "self-serving claims made at the hospital were neither under oath nor subject to cross-examination" and thus "were outside-the-record and do not constitute rebuttal evidence." *L.Z.*, 2015 WL 1332597, at *18.

responsible for the child at the time of the abuse, the viability of the presumption is questionable. ***In re: L.Z.***, 91 [A.3d] 208 (Pa. Super. 2014).

Trial Ct. Op. at 6.

Examining the evidence, the trial court found Grandmother's testimony "extremely creditable" and found she did not perpetuate any of the injuries to Child. ***Id.*** The court further found CYS did not establish by clear and convincing evidence that Mother committed the abuse:

> In this case [M]other [and Father were] constantly present during the time periods when the injuries to the child were sustained, except for brief periods when the child was watched by [G]randmother. . . .
>
> The Court does not believe [CYS] established by clear and convincing evidence that [M]other was the perpetrator of the injuries to the child. Either [F]ather or [M]other could have been the perpetrator . . . .

***Id.*** at 6-7. However, the court found aggravating circumstances against Mother based on her omissions:

> In this case it was obvious that the child had sustained serious injuries on or before October 9, 2013. [G]randmother called both parents['] attention to the injuries consisting of a twitching arm, a black and blue scrotum, bruises on the child and a cut on the child's forehead. All this time the child was fussy and upset.
>
> With this information the parents had a duty to seek medical care for the child.
>
> [M]other indicated an awareness of the need to get medical care and actually left saying she was actually taking the child to the doctor. The [c]ourt is of the opinion that [M]other returned and did not seek medical care because it is likely that she knew what a medical provider would find. This however could be indicative of the fact

that she knew the severity of the injuries because she caused them or she was aware that they were caused by [F]ather. In any event, she had knowledge of serious injuries and failed to take any steps to obtain medical care until October 10th when she took the child to the family physician.

*Id.* at 7.

At the times the parties filed their briefs with this Court and appeared for oral argument, the Supreme Court's decision in ***L.Z.*** was not filed, and thus the Superior Court's decision remained binding. In her appellate brief, Mother avers the trial court's opinion is unclear as whether its finding of aggravated circumstances was "based upon the standard of *prima facie* evidence or other acts of omissions were found by clear and convincing evidence [sic]." Mother's Brief at 44. Mother does not, however, aver the court's conclusion contravened the Superior Court's decision. Nevertheless, on March 25, 2015, our Supreme Court issued its opinion in ***L.Z.***, and we are now bound by that decision.

We agree with the trial court that the evidence established that both Mother and Father were responsible for Child's caregiving and were with him from October 8 through 10, 2013. The court noted there were periods when Child was in Grandmother's exclusive care, but the court credited Grandmother's testimony and found she did not perpetrate any of the injuries to Child. We reject Mother's appeal to this Court to reassess Grandmother's credibility, as the court's findings are supported by competent evidence. ***See In re J.C.***, 5 A.3d at 287-88. A careful review of

- 17 -

Mother's argument reveals she does not deny that she perpetrated the abuse or allege definitively that Father or Grandmother committed the abuse. Instead, her repeated argument is that there were three caregivers, each of whom was alone with Child, who was then seven weeks old, at some point. This claim is evocative of Supreme Court's concern of parents and responsible persons "circl[ing] the wagons" where there are multiple caregivers for a child and an agency has "no ability to assign responsibility for the heinous act among the responsible adults." *See L.Z.*, 2015 WL 1332597 at *18.

Furthermore, Mother's narration of the facts and her claim "that it would be difficult, if not possible, for [her] to know the nature and extent of [C]hild's injuries," ignores evidence presented. *See* Mother's Brief at 35. Mother fails to acknowledge the following evidence cited by the trial court. On October 9, 2013, Grandmother observed a scratch on Child's forehead, that his right arm was "twitching," and "that his scrotum was 'black and blue,'" and "advised [Father] that the child needed to be taken to the emergency room because there was something wrong with" him. Trial Ct. Op. at 3. "[M]other told [G]randmother that [she and Father] just had the child to the doctor and she saw no reason to take the child to the doctor" again. *Id.* Grandmother then "threatened that if they did not take the child," she would. *Id.* When Grandmother returned Child to the parents "and said the child needed to go to the hospital, [M]other packed the child's

- 18 -

things up, put him in the car seat and told [F]ather she was taking him to the hospital." *Id.* at 3-4. Shortly thereafter, however, she returned without seeking medical attention "because she was not going to allow [G]randmother to tell her how to raise her kid or what was wrong with him." *Id.* at 4. Mother then waited until the following day to take Child to the doctor.

Mother did not offer any evidence in rebuttal of CYS' allegations against her. *See L.Z.*, 2015 WL 1332597 at *18. After considering the entire record, we agree with the trial court that Mother's conduct amounted to "omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *See* 42 Pa.C.S. § 6302. Mother thus committed aggravated physical neglect, as defined by the Juvenile Act. *See id.* Accordingly, the trial court did not abuse its discretion in finding aggravated circumstances against her. *See id.*

For the foregoing reasons, we find no relief due on Mother's claims.

Finally, we note the court would have found Father equally culpable for aggravated physical neglect; it stated: "The [c]ourt is completely baffled given this record as to why [CYS] has not filed for a finding of aggravating circumstances against [F]ather and would encourage the Agency to review this case regarding that issue." Trial Ct. Op. at 8.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2015