J-A21042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MEYER-CHATFIELD CORP. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| BANK FINANCIAL SERVICES GROUP, | : | |
| STEVEN GOLDBERG, STEVEN | : | |
| GOLDBERG SOLE PROPRIETORSHIP, | : | |
| DAVID PAYNE, ARNOLD WINICK, | : | |
| WILLIAM BORCHERT AND DANIEL | : | |
| BARBAREE | : | |
| | : | |
| _____ | : | |
| | : | |
| MEYER-CHATFIELD ADMINISTRATIVE | : | |
| SERVICES, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| BANK FINANCIAL SERVICES GROUP, | : | |
| STEVEN GOLDBERG, STEVEN | : | |
| GOLDBERG SOLE PROPRIETORSHIP, | : | |
| DAVID PAYNE, ARNOLD WINICK, | : | |
| WILLIAM BORCHERT AND DANIEL | : | |
| BARBAREE | : | |
| | : | |
| APPEAL OF:  BANK FINANCIAL | : | |
| SERVICES GROUP, STEVEN | : | |
| GOLDBERG, STEVEN GOLDBERG SOLE | : | |
| PROPRIETORSHIP, DAVID PAYNE, | : | |
| ARNOLD WINICK, WILLIAM BORCHERT, | : | |
| DANIEL BARBAREE (THE "BFS | : | No. 3385 EDA 2015 |
| PARTIES") | | |

Appeal from the Order entered October 19, 2015
in the Court of Common Pleas of Montgomery County,
Civil Division, No(s): 2013-29858, 2013-30326,
2014-11331, 2015-02972

MEYER-CHATFIELD CORP.    :  IN THE SUPERIOR COURT OF
               :     PENNSYLVANIA
    v.         :
               :
BANK FINANCIAL SERVICES GROUP, :
STEVEN GOLDBERG, AND DAVID   :
PAYNE             :
               :
               :
_____ :
               :
BANK FINANCIAL SERVICES GROUP, :
STEVEN GOLDBERG; STEVEN    :
GOLDBERG SOLE PROPRIETORSHIP,  :
DAVID PAYNE; AND ARNOLD WINICK :
               :
    v.         :
               :
MEYER-CHATFIELD CORP.    :
               :
APPEAL OF:  BANK FINANCIAL   :
SERVICES GROUP, STEVEN     :
GOLDBERG, DAVID PAYNE, ARNOLD :
WINICK, WILLIAM BORCHERT, DANIEL :
BARBAREE, AND STEVEN GOLDBERG :  No. 227 EDA 2016
SOLE PROPRIETORSHIP

Appeal from the Order entered December 10, 2015
in the Court of Common Pleas of Montgomery County,
Civil Division, No(s): 2013-29858, 2013-30326

BEFORE:  BENDER, P.J.E., DUBOW and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:     **FILED NOVEMBER 15, 2016**

Bank Financial Services Group, Steven Goldberg ("Goldberg"), Steven

Goldberg Sole Proprietorship, David Payne, Arnold Winick, William Borchert

and Daniel Barbaree (collectively "Defendants") appeal from (1) the October

19, 2015 Order granting a preliminary injunction in favor of Meyer-Chatfield

Corporation ("Meyer-Chatfield"); and (2) the December 10, 2015 Order

denying Defendants' Motion to Dissolve, Modify, and/or Clarify the Preliminary Injunction Order (the "Motion to Dissolve").[1]  We dismiss the appeal as moot.

In its Opinion, the trial court set forth the relevant factual and procedural background, which we adopt for the purpose of this appeal.  ***See*** Trial Court Opinion, 12/29/15, at 1-9.  On October 28, 2015, Defendants filed a timely Notice of Appeal of the October 19, 2015 Order.  On December 2, 2015, Defendants filed the Motion to Dissolve, which the trial court denied on December 10, 2015.  Defendants thereafter filed a Notice of Appeal of the December 10, 2015 Order.[2]

On appeal, Defendants raise the following issues for our review:

1. Did the trial court commit legal error in issuing, and then refusing to dissolve, modify, or clarify, an [i]njunction to enforce restrictive covenants in an agreement, when the covenants are invalid because no consideration was given for any of the agreement's renewal terms?

2. Did the trial court commit legal error in enjoining, and then refusing to dissolve, modify, or clarify the [O]rder enjoining, competition in 13 states, when the agreement it purports to enforce limits competition in only two; the agreement was never amended in writing to add other states to the

---

[1] Defendants separately appealed the two Orders.  We consolidated the two appeals pursuant to Pa.R.A.P. 513.

[2] We note that this is an interlocutory appeal as of right from the grant, in part, of a preliminary injunction, pursuant to Pennsylvania Rule of Appellate Procedure 311(a)(4) (stating, "[a]n appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) from … [a]n order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction…[]").

restriction, as the contract requires; and [Meyer-Chatfield] gave no consideration to restrain competition in any additional states?

3. Did the trial court commit legal error in enjoining, and then refusing to dissolve, modify, or clarify the [O]rder enjoining, competition in servicing [bank-owned life insurance] policies, where [Meyer-Chatfield] does not provide such services and none of the [D]efendants had an employment relationship or non-compete agreement with Meyer-Chatfield Administrative Services, LLC [], the separate Meyer-Chatfield affiliate that provides such services?

4. Did the trial court commit legal error in issuing, and then refusing to dissolve, modify, or clarify, an [i]njunction that enjoins competition with all banks with which Meyer-Chatfield has ever done business, when the agreement it purports to enforce restricts competition only as to banks with which Meyer-Chatfield transacted [business] as of August 16, 2013?

5. Did the trial court commit legal error in enjoining, and then refusing to dissolve, modify, or clarify the [O]rder enjoining "anyone acting on [Goldberg's] behalf, including [the named Defendants]," from competing with Meyer-Chatfield, without clarifying that the other Defendants may compete independently of Goldberg, where Goldberg is the only Defendant bound by a restrictive covenant?

6. Did the trial court commit legal error in issuing, and then refusing to dissolve, modify, or clarify, an [i]njunction that enjoins competition from October 2015 to October 2016, where the one-year restrictive covenants had expired before the [i]njunction was issued and a prior [O]rder had already enjoined competition for seven months?

7. Did the trial court commit legal error in issuing, and then refusing to dissolve, modify, or clarify, an [i]njunction that does not definitely, clearly, and precisely set forth the banks (which] Defendants are prohibited from contacting[,] or the conduct from which they are prohibited?

8. Did the trial court commit legal error in enjoining, and then refusing to dissolve, modify, or clarify the [O]rder enjoining, the disclosure or use of "Confidential Information" without

adequately specifying the information or the conduct that is prohibited as to such information, and where the information is not protectable because it is publicly available and/or was disclosed by Meyer-Chatfield?

9. Did the trial court abuse its discretion in issuing the [i]njunction where there is not apparently reasonable ground for finding [that] it was needed to avoid irreparable harm, and no finding was made that the [i]njunction would not cause more harm than it intended to prevent?

10. Did the trial court err in requiring Meyer-Chatfield to post an injunction bond of only $1,000.00 and refusing to modify the [i]njunction to require a greater bond, when [D]efendants' likely damages from the improperly issued [i]njunction far exceed $1,000[.00]?

11. Did the trial court commit legal error when it found that the arguments in the [M]otion to dissolve, modify, and/or clarify the [i]njunction were waived or when it otherwise rejected them because it incorrectly treated the [M]otion as an untimely motion for reconsideration, when a motion to dissolve an injunction may be brought "at any time" and is governed by a different standard than one for reconsideration?

12. Did the trial court abuse its discretion and/or commit legal error when it held that the ends of justice would not be served by dissolving, modifying, or clarifying the [i]njunction, particularly when it provided no principled basis to conclude that it exercised its discretion properly in denying the Motion to Dissolve?

Brief for Appellants at 4-7.

Appellate courts review the grant of a preliminary injunction for an abuse of discretion:

> The standard of review applicable to preliminary injunction matters … is highly deferential. This highly deferential standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine

the record to determine if there were any apparently reasonable grounds for the action of the court below.

***Duquesne Light Co. v. Longue Vue Club***, 63 A.3d 270, 275 (Pa. Super. 2013) (citation and internal quotation marks omitted).

Prior to addressing the merits of Defendants' appeal, we must first determine whether this appeal is moot.

> As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot.  An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law.  In that case, an opinion of this Court is rendered advisory in nature.  An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.

***In re L.Z.***, 91 A.3d 208, 212 (Pa. Super. 2014) (quoting ***In re D.A***., 801 A.2d 614, 616 (Pa. Super. 2002) (*en banc*).

Here, the dispute centers on a preliminary injunction Order that prohibited Defendants from engaging in certain conduct for a one-year period extending from October 19, 2015, to October 19, 2016.  ***See*** Preliminary Injunction Order, 10/19/15, at 2*.*  That Order expired on October 19, 2016.  Therefore, Meyer-Chatfield can no longer enforce the Order.  Accordingly, an actual case or controversy no longer exists between Defendants and Meyer-Chatfield.  Because the Defendants are no longer

required to abide by the injunction, our review would be of no effect. **See**

**In re L.Z.**, 91 A.3d at 212.[3]  Accordingly, we dismiss the appeal as moot.[4]

Appeal dismissed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2016

---

[3] There are three exceptions to the mootness doctrine: "this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: (1) the case involves a question of great public importance, (2) the question presented is capable of repetition and apt to elude appellate review, or (3) a party to the controversy will suffer some detriment due to the decision of the trial court." **In re D.A.**, 801 A.2d at 616.  However, none of the exceptions to the mootness doctrine apply to the facts of this case, as (1) this matter involves an interpersonal dispute regarding a non-compete provision in the contract of a single former employee; (2) questions regarding the enforceability of the provision will not arise again as Meyer-Chatfield no longer employs Goldberg; and (3) Defendants will not suffer detriment without this Court's ruling, as the provision is no longer enforceable.

[4] In a letter written to this Court following the close of briefing, Defendants assert that the appeal should not be dismissed as moot, on the basis that such a ruling would adversely affect Defendants' ability to recover lost profit damages if the injunction had been improvidently granted.  However, even if the appeal was not moot, we would have determined that the injunction was properly granted for the reasons expressed by the trial court in its Opinion. **See** Trial Court Opinion, 12/29/15, at 10-15; **see also** Trial Court Opinion, 3/14/16, at 1-6.

IN THE COURT OF COMMON PLEAS OF
MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL DIVISION

| | | |
|---|---|---|
| MEYER-CHATFIELD CORP. | : | **Sup. Ct. No. 3385 EDA 2015** |
| | : | **Com. Pleas No. 2013-30326** |
| v. | : | |
| | : | |
| BANK FINANCIAL SERVICES | : |  |
| GROUP, STEVEN GOLDBERG, | : | |
| STEVEN GOLDBERG SOLE | : | 2013-30326-0449  12/29/2015 2:56 PM  # 10612878 |
| PROPRIETORSHIP, DAVID PAYNE | : | Opinion |
| ARNOLD WINICK, WILLIAM | : | Rcpt#Z2612626  Fee:S0.00 |
| BORCHERT, and DANIEL | : | Mark Levy - MontCo Prothonotary |
| BARBAREE | : | |

OPINION

Moore, J.                                                                              December 29, 2015

## I.      FACTS AND PROCEDURAL HISTORY

The question presented by this appeal is whether this Court properly issued a preliminary

injunction against Steven Goldberg and anyone acting on his behalf, including Bank Financial

Services Group ("BFS"), Arnold Winick, David Payne, William Borchert, and Daniel Barbaree

(collectively, the "BFS Parties" or "Defendants").

Meyer-Chatfield Corporation ("Meyer-Chatfield")[1] is a company in the business of

providing bank-owned life insurance ("BOLI"), a highly specialized financial product.  BOLI is

a single premium life insurance contract specifically designed for banks to earn tax-free income,

among other benefits.  Since its beginnings in 1992, Meyer-Chatfield has been engaged in the

design, marketing, sales, and servicing of BOLI products to the banking community nationwide.

In 1999, Meyer-Chatfield hired Steven Goldberg as a BOLI sales representative.  Prior to

coming to Meyer-Chatfield, Goldberg was an aluminum siding salesman.  Thus, Goldberg was

the beneficiary of training programs and leads particular to the BOLI business that were provided

---

[1] Meyer-Chatfield's principal place of business is at 261 Old York Road, Suite 724, Jenkintown, Pennsylvania.

by Meyer-Chatfield. On March 3, 2003, Goldberg executed a sales representative agreement with Meyer-Chatfield (the "Goldberg Contract", or the "Contract"). (*See* Ex. J-100) (hereinafter, "Goldberg Contract"). With Meyer-Chatfield's support, Goldberg became an extremely successful BOLI salesman, earning in excess of $2,000,000.00 in commissions during multiple years.

Pursuant to the terms of the Contract, defendant Steven Goldberg agreed that, during his tenure and for a period of one year following the termination of the Goldberg Contract, he would not, on behalf of himself, any person, firm, corporation, association, or other entity, excluding Meyer-Chatfield:

(i) Solicit, serve, divert, disclose, utilize in any way, or provide information concerning clients, customers and referral sources of Meyer-Chatfield or other Meyer-Chatfield confidential information or proprietary information to any individual or business entity;

(ii) Induce or attempt to induce any bank or Certified Prospect[2] not to do business with Meyer-Chatfield;

(iii) Induce or attempt to induce any individual or referral source to refrain from referring clients or business to Meyer-Chatfield for in connection with a BOLI transaction or completing a BOLI transaction;

(iv) Publish, disseminate or transmit, either verbally, by written or electronic communication or by any other means, any disparaging or derogatory statements or materials concerning Meyer-Chatfield, its shareholders, employees, agents, clients, vendors, or referral sources;

(v) Directly, indirectly or otherwise divulge any confidential information or proprietary information to any person, firm or corporation, use for its own benefit or the benefit of anyone or entity other than Meyer-Chatfield. "Confidential Information" includes, but is not limited to, Meyer-Chatfield intellectual property, material, information, data, lists, know how, procedures, referral sources, marketing materials, etc., which was learned by of or used by the sales representative during the term of this agreement;

---

[2] A "Certified Prospect" is a financial institution or corporation contacted by a Meyer-Chatfield sales representative, such as Goldberg, during the one year period before termination of the Contract.

(vi)   Directly or indirectly attempt to solicit any employee or independent contractor of Meyer-Chatfield to cease working with Meyer-Chatfield, or enter into any type of relationship with said individuals or business entities; and

(vii)  Compete directly or indirectly within his Territory with and for any business in which Meyer-Chatfield is engaged at the time of Termination or separation.

(Goldberg Contract § 7.01(A)).

"Territory", as set forth in the Goldberg Contract, is defined as Pennsylvania, New Jersey, and any other states that may be assigned to Goldberg. (Goldberg Contract § 1.03). As the testimony before this Court made clear, Goldberg's Territory expanded to include, at least, New York, Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, Maryland, and Delaware. (*See* N.T. 10/24/14, p. 78; N.T. 10/23/14, p. 48; N.T. 12/3/14, pp. 20-25).

Goldberg also had a contractual obligation under the Contract to "not attempt to divert BOLI Business away from [Meyer-Chatfield] for any reason." (Goldberg Contract § 6.01(C)).

The Goldberg Contract was entered into for an initial one year term from March 7, 2003 to March 7, 2004 (the "Term"), and was automatically renewed every year "unless either party notifie[d] the other party in writing at least three (3) months prior to the end of the Term or any renewal thereof that it elects to terminate [the Goldberg Contract], in which event [the Goldberg Contract] shall expire upon the expiration of the then current renewal term." (Goldberg Contract § 2.01).

In the event of Goldberg's breach of the Contract, the one year term relating to Goldberg's restrictive covenants did not begin to run until the date Goldberg cured his breach or breaches. Goldberg also agreed that he would be prohibited from working with a Strategic

Partner[3] for the one (1) year period following termination of the Goldberg Contract. (Goldberg Contract § 7.01).

On August 16, 2013, Goldberg purported to tender his resignation to Meyer-Chatfield, effective immediately. However, pursuant to the terms of the Goldberg Contract, Goldberg's resignation could not be effective until March 7, 2014, at the earliest, at which time the covenants contained in the Goldberg Contract, which prohibited Goldberg from engaging in certain restricted activities, as more fully described above, would continue for a period of one (1) year from the date of termination or March 7, 2015, at the earliest. Meyer-Chatfield terminated Goldberg for cause, effective immediately on March 5, 2014 as a result of his material and repeated breaches of the restrictive covenants in the Goldberg Contract and other unlawful conduct.[4]

For years, Goldberg and Arnold Winick had marketed and sold BOLI products as partners, on behalf of Meyer-Chatfield. (N.T. 10/23/14, p. 45). In 2013 or earlier, Goldberg and Winick conspired with each other and representatives of BFS, namely Borchert and Barbaree and possibly others, to incite a coordinated departure of employees from Meyer-Chatfield to Bank Financial Services. Goldberg and/ or Winick, and possibly others, solicited and induced David Payne, David Schwartz, and Joseph Byrd to join them in leaving Meyer-Chatfield and beginning with BFS. The plan for departure included copying Confidential Information and customer lists

---

[3] The Contract defined a "Strategic Partner" as "an individual or organization that typically works with the banking, financial, and insurance communities which or who has an agreement with M-C." (Goldberg Contract § 1.06).

[4] This Court found that Goldberg's breaches were ongoing up until this Court's issuance of its October 19, 2015 Preliminary Injunction Order, and thus commencement of the one year period was tolled until after Goldberg's breaches had been cured as per his Contract. (*See* Goldberg Contract § 7.01(C)(i)) ("Furthermore, the restrictive covenants hereinabove shall survive the termination of this Agreement for the longer of one (1) year from and after the date of Termination or expiration of this Agreement or one (1) year after full compliance by [Goldberg] following any breach.").

from Meyer-Chatfield computers. Payne, Schwartz, and Byrd each agreed to join Goldberg and Winick and participate directly in the scheme.

On May 11, 2013, Winick communicated with Goldberg regarding "our understanding along with our desired expectations to [sic] joining BFS"—namely, that they would become BFS's New England and Northeast regional partners, address "client takeovers", and generate business from "SG/AW clients",[5] who, in reality, were actually all Meyer-Chatfield clients. (Ex. P-47). Specifically, partners Goldberg and Winick agreed and understood the following:

> New England and Northeast Regional partners
> Primary sales and servicing responsibility for banks/ credit unions in
> VA, WV, DC, MD, PA, NJ, DE, NY, CT, MA, RI, NH, VT, ME
> Protect existing renewal commissions for Current BFS Clients
> Generate new revenue opportunities within existing BFS/SGAW clients
> Create and close new client prospects
> Commission Split 75% SGAW/ 25% BFS First year and Renewal

(Ex. P-47). Goldberg and Winick specifically sought to discuss and to clarify with defendants Borchert and Barbaree the topic of "client takeover". (Ex. P-47). At the time, Goldberg and Winick's only clients were Meyer-Chatfield clients. Indeed, prior to joining Meyer-Chatfield, Goldberg had no BOLI clients whatsoever. (*See* N.T. 9/17/15, p. 153).

On May 30, 2013, Winick e-mailed to himself a Memorandum of Understanding laying out the "terms and conditions of the proposed business relationship between Arnold Winick/ Steven Goldberg (AW/SG) and Bank Financial Services (BFS) as of May 2013." (Ex. P-48).

In May 2013, defendant Joseph Savino met with Goldberg, who advised Savino that: Goldberg planned to transition his Meyer-Chatfield "team"—i.e., Winick, his partner, Payne, the attorney, Schwartz, a BOLI administrator, and Byrd, the "tech guy"—from Meyer-Chatfield to its direct competitor, BFS, Borchert and Barbaree; Goldberg had informed a "network" of people in

---

[5] That is, Steven Goldberg/ Arnold Winick clients.

the BOLI community—i.e., Meyer-Chatfield's bank customers and referral sources—that he and his "team" were leaving Meyer-Chatfield; Goldberg would be placing over 200 phone calls to his "network" and that, by doing so, Goldberg would generate a substantial amount of business for Savino and the Savino Group and that he had already made forty such phone calls. (Ex. P-34, pp. 81-89; 90-102; 159; 170-71).

On July 9, 2013, Barbaree e-mailed Winick a "Letter of Understanding For Joint Venture between Bank Financial Services Group & BFS-Northeast" for both Winick and Goldberg (to be executed separately), laying out the purpose of their joint venture and the respective duties of each joint venture partner. Given the impropriety, Borchert directed Barbaree to provide the agreement to Winick, Goldberg's partner/ sidekick, so that Winick could then deliver it to Goldberg, as opposed to Borchert/ Barbaree delivering it directly to Goldberg. (Ex. P-78).

A day later, Borchert sent Barbaree an e-mail attaching an "Addendum #1" to the Letter of Understanding, with a request that Barbaree forward it to Winick, that obligated BFS to "pay all legal fees for Steven Goldberg and/or Arnie Winick that may be required from any/all legal actions created from their leaving Meyer-Chatfield and engaging as Regional Partners and sales associates of BFSG." (Ex. P-32(B)). On August 16, 2013, the same day that Goldberg and Winick left Meyer-Chatfield together as partners to join BFS, Goldberg, Winick, Borchert, and Barbaree executed the "Letter of Understanding For Joint Venture Between Bank Financial Services Group & BFS-Northeast" and "Addendum #1" thereto, laying out the purpose of their joint venture and the respective duties of each joint venture partner. (Exs. P-32(A), (B), and (C)). The Letter and Addendum were signed by Goldberg and Winick each as "Partner" of BFS-Northeast. *See id.* Borchert and Barbaree signed the documents as "CEO" and "President", respectively.

6

Upon joining BFS, Schwartz and Goldberg, and others at BFS, used Meyer-Chatfield's Confidential Information to make BOLI presentations and to sell BOLI on behalf of BFS to Meyer-Chatfield clients and to cause Meyer-Chatfield's existing clients to alter their existing Commission Split Agreements by replacing Meyer-Chatfield as the Agent or Broker of Record with Borchert, BFS, Goldberg and/or Winick. (N.T. 10/23/14, p. 94).

On October 30, 2013, Zachary Low, BFS-Northeast vice-president of sales, discussed in an e-mail with Winick the next month's schedule for "takeover presentations" and "change of broker letters" at thirteen Meyer-Chatfield client banks. (Ex. P-66). Borchert, BFS Founder and CEO, outwardly supported BFS, Goldberg, and Winick's continuous efforts to transfer clients from Meyer-Chatfield to BFS, stating: "Excellent work bringing in your clients under our BFS banner. Well done. Keep getting those bankers to sign and Tony will process them quickly and efficiently so we generate more revenue for all of us. Go get 'em!" (Ex. P-50).

To date, Defendants have taken over nearly thirty banks that purchased BOLI products through Meyer-Chatfield to change agent of record designations with carriers so as to eliminate Meyer-Chatfield's and Meyer-Chatfield Administrative Services's ("MCAS")[6] receipt of hundreds of thousands of trail commissions per year for many years into the future. (N.T. 10/24/14, p. 33). In fact, Goldberg admitted during the preliminary injunction hearing before this Court that he has never stopped soliciting and attempting to sell BOLI to Meyer-Chatfield clients. (*See* N.T. 9/18/15, p. 6). Indeed, immediately after leaving Meyer-Chatfield and joining BFS, Goldberg testified he and/or the other former Meyer-Chatfield personnel, i.e., Winick, sold BOLI to the following Meyer-Chatfield clients: Guaranty Bank (Colorado) (N.T. 9/18/15, pp. 51-52, 63, 93); Salisbury Bank (Connecticut) (N.T. 9/18/15, pp. 52, 92-93); Bridgehampton National Bank

---

[6] See Section II(D) of this Opinion, below, for an explanation as to why MCAS is an entity "separate" from Meyer-Chatfield Corporation.

(New York) (N.T. 9/18/15, pp. 8, 102-103); Chelsea Groton Bank (Connecticut) (N.T. 9/18/15, pp. 90-91); Greylock Federal Credit Union (Massachusetts) (N.T. 9/18/15, pp. 91-93); Community National Bank (New York) (N.T. 9/18/15, p. 92); New Tripoli (Pennsylvania) (N.T. 9/18/15, pp. 93-94); Farmington Bank (Connecticut) (N.T. 9/18/15, p. 95); Rollstone Bank (Massachusetts) (N.T. 9/18/15, p. 95); Customers Bank (Pennsylvania) (N.T. 9/18/15, p. 95); and Hamilton Federal Bank Services (Maryland) (N.T. 9/18/15, pp. 117-18). Defendants diverted the following additional banks from Meyer-Chatfield to BFS in contravention of the Goldberg Contract's restrictions: Manasquan Savings Bank; 1st Colonial National Bank; Sanford Institution for Savings; Fraternity Federal Savings and Loan Association; Kearney Federal Savings Bank; Putnam Bank; Litchfield Bancorp, Collinsville Savings Society and Northwest Community Bank; First Clover Leaf Bank; First National Bank of Suffield; Cenlar; Continental Bank; Omni American Bank; Bank of Charlestown; Family First Bank; Windsor Federal Savings; and Profile Bank.

On October 2, 2013 Meyer-Chatfield filed a complaint in which BFS, Goldberg, and Payne were named as defendants.[7] This complaint alleges that defendants Payne and Goldberg, together with BFS, formed and executed upon a plan to take Meyer-Chatfield personnel, clients, and confidential and proprietary information, in violation of the individual defendants' contractual and fiduciary obligations to the company, and in an unfairly competitive manner. The complaint alleges that BFS actively participated in this unlawful conduct. Subsequently, Meyer-Chatfield petitioned this Court to enter a preliminary injunction requiring the named defendants to desist in certain behavior enumerated in Goldberg's employment agreement.

---

[7] *See* Complaint at Docket Number 2013-29858.

Altogether, this Court held twelve days of hearings on Meyer-Chatfield's motion for preliminary injunction. On October 19, 2015, this Court entered an Order granting Meyer-Chatfield's motion for preliminary injunction. Defendants now appeal from this Court's Preliminary Injunction Order.

## II. DISCUSSION

### A. LEGAL STANDARDS

Review of a trial court's order with respect to a preliminary injunction is "highly deferential." *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 248 (Pa. Super. 2013) (quoting *Warehime v. Warehime*, 860 A.2d 41, 46 (Pa. 2004)). A reviewing court does not inquire into the merits of the controversy. *Hoffman v. Steel Valley Sch. Dist.*, 107 A.3d 288, 290 (Pa. Cmwlth. 2015). Instead, appellate courts conduct a limited examination of the record to determine whether there are any apparently reasonable grounds for the trial court's action. *Id.* A trial court has reasonable grounds for entering an injunction where it properly finds that all of the essential prerequisites are satisfied. *WMI Group, Inc. v. Fox*, 109 A.3d 740, 748 (Pa. Super. 2015).

> There are six "essential prerequisites" that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest." The burden is on the party who requested preliminary injunctive relief . . . .

9

*Synthes USA Sales, LLC*, 83 A.3d at 249 (quoting *Warehime v. Warehime*, 860 A.2d 41, 46-47 (Pa. 2004)). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous of misapplied will [an appellate court] interfere with the decision of the trial court." *Fox*, 109 A.3d at 748.

> **B.      MEYER-CHATFIELD MET ITS BURDEN OF SHOWING THAT A PRELIMINARY INJUNCTION SHOULD BE ENTERED BY THIS COURT**

This Court found that Meyer-Chatfield was likely to succeed on the merits of its case. Meyer-Chatfield established that Goldberg signed a contract containing restrictive covenants. This contract was in effect at the time that Goldberg purported to resign from his position as BOLI sales representative with Meyer-Chatfield. The contract forbade Goldberg from competing directly or indirectly with Meyer-Chatfield in Goldberg's assigned Territory. The evidence established that Goldberg left Meyer-Chatfield, promptly joined BFS, and began competing, directly and indirectly, against his former employer in violation of the restrictive covenants that he signed.

The injury arising from the breach of the covenant not to compete was not compensable by money damages alone. *See Records Ctr., Inc. v. Comprehensive Mgmt., Inc.*, 525 A.2d 433, 436 (Pa. Super. 1987) ("[T]he injury caused by violation of a covenant note to compete is particularly difficult to quantify for damage purposes. As stated in *Schwartz v. Laundry & Linen Supply Drivers*, 339 Pa. 353, 14 A.2d 438 (1940): 'The great weight of modern authority is to the effect that one who has been or will be injured [by violation of a covenant not to compete] is ordinarily entitled to the equitable remedy of injunction . . . .'") (citation omitted). In the absence of this Court's imposition of a preliminary injunction, Meyer-Chatfield would have been entirely deprived of the benefit of the restrictive covenant that Goldberg signed and Meyer-

10

Chatfield paid for. This Court's Order restored the parties to their positions prior to this litigation. That is, Goldberg is now subject to all of the restrictions contained in the Contract that he signed with Meyer-Chatfield, which restrictions he flouted prior to this Court's entry of a preliminary injunction.

## C. THE PRELIMINARY INJUNCTION ORDER ENTERED BY THIS COURT IS REASONABLY SUITED TO ABATE THE OFFENDING CONDUCT OF DEFENDANTS

This Court's Order is tailored to address the harm caused by the direct and indirect violations of the restrictive covenants contained in the Goldberg Contract. This Court's Order states as follows:

1. Steven Goldberg, and anyone acting on his behalf, including BFS, BFS-Northeast, Arnold Winick, William Borchert and Daniel Barbaree, is hereby enjoined, for a period of one year from the date of this Order for Preliminary Injunction, from:

    i. Competing, directly or indirectly, within the states of PA, NJ, NY, MA, ME, CT, MD, NH, DE, VT, RI, CO and TX, for any bank owned life insurance ("BOLI") business to banks with which Meyer-Chatfield had transacted on or before August 16, 2013, including both sales and servicing of BOLI;

    ii. Diverting existing BOLI business away from Meyer-Chatfield;

    iii. Soliciting or inducing, or attempting to induce, any existing bank client of Meyer-Chatfield not to do business with Meyer-Chatfield or to cease doing business with Meyer-Chatfield; and

    iv. Directly or indirectly using or divulging any Meyer-Chatfield confidential and/or proprietary information to any person, firm or corporation, for their own benefit or the benefit of any person or entity other than Meyer-Chatfield.

(Prelim. Inj. Order). The substance of this Court's Order is derived from the restrictive covenants contained in the Goldberg Contract. The Order enjoins Goldberg and those acting on his behalf. This Court deemed such a provision necessary, as Meyer-Chatfield presented

11

substantial evidence demonstrating that individuals and entities were acting unlawfully on behalf of, and in conjunction with, Goldberg and BFS, including Borchert, Barbaree, Winick, and BFS-Northeast. This Court further found that Goldberg and Winick act as partners through BFS-Northeast, a joint venture with Borchert, Barbaree, and BFS.[8] This Court's Order is crafted to prevent the named individuals and entities from acting in such a way that allows Goldberg to circumvent the restrictions imposed by his Contract with Meyer-Chatfield.[9] In this way, the remaining Defendants can be enjoined.

The Preliminary Injunction Order's non-compete provision has geographic limitations with respect to bank clients with whom Meyer-Chatfield had a business relationship prior to August 16, 2013. The Order limits the injunction to those states where the evidence indicated that Goldberg sold BOLI, i.e. Goldberg's Territory. Christopher Pezalla and David Spingler, credible witnesses from Meyer-Chatfield, testified that Goldberg's "Territory" expanded to include, at least, New York, Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, Maryland, and Delaware. (N.T. 10/24/14, p. 78; N.T. 10/23/14, p. 48; N.T. 12/3/14, p. 76). Furthermore, in Goldberg's own complaint filed in this matter, which he verified, he claims

---

[8] Goldberg testified that he is not and has never been Winick's partner and that neither he nor Winick are partners of Borchert and BFS. However, Goldberg signed contracts with Winick and Borchert as "partners". (*See* Exs. P-32(A), (B), and (C)). He has also submitted several affidavits to this Court identifying himself as a Partner of BFS. Winick has as well.

Goldberg testified that he and Winick left Meyer-Chatfield and joined BFS independent of one another. This Court did not find that statement credible. Goldberg and Winick were partners at Meyer-Chatfield for years, left Meyer-Chatfield on the same day, and joined BFS together, as partners. That the partnership continues to this day. In addition, numerous e-mails, text messages, and agreements exchanged between Goldberg and Winick demonstrate that it is more likely than not that they had a common plan to simultaneously leave Meyer-Chatfield and join BFS. (*See* Exs. P-32(A), (B), and (C), P-47, and P-48). Accordingly, this Court found that Golberg and Winick operated as partners at BFS.

[9] For the legal grounds supporting the entry of a preliminary injunction preventing others from acting at the behest of an employee subject to a restrictive covenant, see *Records Ctr., Inc. v. Comprehensive Mgmt., Inc.*, 525 A.2d 433, 434-35 (Pa. Super. 1987) ("We recognize that [employees subject to restrictive covenants] must not be permitted to achieve indirectly that which they may not do directly. Certainly, they may not violate the restrictive covenants by acting through [employees not subject to restrictive covenants]."). The legal principle enunciated in *Record Center* applies here, where, as this Court has found, Goldberg directly violated the provisions of his contract with Meyer-Chatfield, and did so indirectly via BFS, Borchert, and Winick, among others, acting as proxies.

12

to be entitled to recover commissions in his "Territory", pursuant to the Goldberg Contract, from the sales of BOLI in Pennsylvania, New Jersey, Massachusetts, Connecticut, New York, Delaware, and elsewhere. In addition, Attorney David Payne, working at Goldberg's direction, drafted a Meyer-Chatfield document in August 2013, identifying Goldberg's protected territory as Pennsylvania, New Jersey, Massachusetts, Maine, Connecticut, Maryland, New Hampshire, Delaware, Vermont, Rhode Island, and New York. (Ex. P-46). Therefore, the admissions and evidence established that Goldberg's Territory expanded well beyond Pennsylvania and New Jersey. That is, the evidence demonstrated that states were subsequently added to Goldberg's assigned "Territory".

Furthermore, the Preliminary Injunction Order does not address Meyer-Chatfield clients already acquired by Defendants. The Order prohibits Defendants from attempting to acquire existing clients of Meyer-Chatfield for a period of one year from October 19, 2015 regardless of geographic location. In addition to that nationwide restriction, the Order proscribes Defendants from attempting to acquire bank clients in Goldberg's identified Territory with whom Meyer-Chatfield had a business relationship prior to August 16, 2013.

**D.    MEYER-CHATFIELD ADMINISTRATIVE SERVICES IS ENTITLED TO THE BENEFITS OF THE PRELIMINARY INJUNCTION ORDER**

Initially, it should be noted that this Court found that Meyer-Chatfield and Meyer-Chatfield Administrative Services constitute essential parts of a single service. That is, although Meyer-Chatfield and MCAS are technically separate legal entities, they are fully integrated. This is demonstrated by the fact that Meyer-Chatfield and MCAS operate out of the same office location at 261 Old York Road, Suite 604 in Jenkintown, Pennsylvania. The testimony of David Spingler, Chief Operating Officer of Meyer-Chatfield for a time, explained that the two entities are actually "one in the same." MCAS was created to provide BOLI servicing on behalf of

Meyer-Chatfield Corporation, and was established as a separate legal entity to provide assurance to bank clients that if Meyer-Chatfield Corporation ceased to exist, MCAS would remain to provide the necessary servicing which lasts for the life of the policy.

The Goldberg Contract specifically provides that MCAS "shall provide ongoing after sales support services to [Goldberg]." The Goldberg Contract also explicitly provides that Meyer-Chatfield Corporation shall arrange for the servicing and administration of a BOLI case through MCAS and that MCAS "shall receive a fee for services provided before any fee split under this Agreement." Thus, the Goldberg Contract contemplates the integral role that MCAS plays in BOLI transactions. Accordingly, as this Court finds that there is no practical difference between Meyer-Chatfield Corporation and MCAS for purposes of this litigation, the Preliminary Injunction Order can properly prohibit Defendants from competing with MCAS.

Furthermore, this Court finds that even assuming *arguendo* that the entities did not operate as a unified whole, MCAS would properly be deemed a third party beneficiary under the Goldberg Contract. "[A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself . . . ." *Altoona City Auth. v. L. Robert Kimball & Assocs.*, 26 Pa. D.&.C.4th 521, 528 (Pa. C.P. 1995) (citing *Scarpitti v. Weborg*, 609 A.2d 147, 150-51 (Pa. 1992)). Here, the express terms of the Goldberg Contract demonstrate the intent of the parties to make MCAS a third party beneficiary thereof. MCAS serves as, among other things, the captive and exclusive servicing arm of Meyer-Chatfield. The Goldberg Contract specifically provides that MCAS "shall provide ongoing after sales support services to [Goldberg]." The Goldberg Contract specifically provides that Meyer-Chatfield Corporation shall arrange for the servicing and administration of a BOLI case through MCAS and that MCAS "shall receive a fee for services provided before any fee split under this

14

Agreement." MCAS is, therefore, the servicing or administering agent to Goldberg under the Goldberg Contract. Thus, MCAS has recognized contractual rights pursuant to the Goldberg Contract to receive commissions arising from the servicing of BOLI cases. Therefore, MCAS is a third party beneficiary of the Goldberg Contract pursuant to the contract's terms.

As a third party beneficiary of the Goldberg Contract, MCAS is entitled to the same contractual protections as Meyer-Chatfield Corporation, including injunctive relief.

## III.    CONCLUSION

This Court's determinations were proper and accordingly, this Court's Order should be **AFFIRMED**.

BY THE COURT:

_____
BERNARD A. MOORE, J.

Date:    December 29, 2015
Cc:    David L. Braverman, Esq.
        Benjamin A. Garber, Esq.
        Matthew J. Siembieda, Esq.
        Timothy D. Katsiff, Esq.
        Eric B. Smith, Esq.
        James B. Shrimp, Esq.
        Alan L. Frank, Esq.
        Samantha A. Millrood, Esq.
        Sean A. Meluney, Esq.
        H. Jeffrey Brahin, Esq.